**SWIFT TRANSPORTATION CO., INC., Respondent and Cross-Appellant,**

v.

**Vernon SWEARENGIN and Everett Ellison, Appellants and Cross-Respondents.**

**Nos. 14102, 14109.**

Missouri Court of Appeals, Southern District, Division Two.

April 8, 1986.

William A. Moon, Richard W. Moon, Moon, Moon & Moon, Springfield, for appellants and cross-respondents Vernon Swearengin and Everett Ellison.

Robert W. Stillings, Springfield, for respondent and cross-appellant Swift Transportation Co., Inc.

CROW, Judge.

Vernon Swearengin ("Swearengin") and Everett Ellison ("Ellison") appeal from a $27,836.68 judgment against them in favor of Swift Transportation Co., Inc., ("Swift"). Swift cross-appeals, insisting the trial court erred in denying Swift's prayer for attorney fees and pre-judgment interest.

The cause was tried by the court without a jury; consequently, the scope of our review is defined by *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). The judgment will be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

Swift is "a common carrier engaged in the business of transporting property by motor vehicle." The suit arose from a written "lease agreement" entered into on August 25, 1982, at Swift's office in Springfield, Missouri, between Swift, as "Carrier," and Swearengin, as "Contractor." Under the agreement, a tractor and a trailer owned by Swearengin were leased to Swift for the purpose of hauling 4,213 cases of imitation cheese from Carthage, Missouri, to New Orleans, Louisiana.

Swearengin's trailer, characterized as a "reefer," was equipped with a refrigeration unit, a necessity inasmuch as the shipper of the cheese, Schreiber Foods, Inc. ("Schreiber"), required that during the journey, the temperature of the cheese be maintained between 35 and 40 degrees.[1]

Under the lease, Swearengin's tractor-trailer unit was to be operated by Ellison, who signed the lease on behalf of Swearengin. The testimony showed, and the trial court found, that for several months prior to August 25, Swearengin and Ellison had a business arrangement with Swift whereby Ellison would sign "trip leases" to haul freight for Swift to specified destinations for agreed amounts. Ellison, using Swearengin's equipment, would make the deliveries, and he and Swearengin, after payment of expenses, would divide evenly the mo-

---

1. References to temperature are to degrees fahr-    enheit.

nies received from Swift. The trial court found that Ellison and Swearengin, in this arrangement, were joint venturers. That finding is unchallenged here.

On August 25, after Ellison signed the lease, he drove Swearengin's tractor-trailer unit from Springfield to Schreiber's plant in Carthage, where Schreiber's employees loaded the cheese into the trailer.

Ellison then drove the unit to New Orleans, arriving on the morning of August 27. The cheese was to be unloaded at a dock for shipment by boat to Puerto Rico. There was sufficient evidence to support the trial court's finding that when the trailer was opened at the dock, the trailer's refrigeration unit was not operating, the unit's temperature control was set at 65 degrees, the air temperature inside the trailer was 70 degrees, and the temperature of the cheese ranged between 60 and 66 degrees.

Because of the temperature, the cheese had begun to "separate," a process in which the fat component changes from solid to liquid and "begins to drip." A dock official telephoned Schreiber's headquarters in Green Bay, Wisconsin, and reported the condition of the cheese.

A Schreiber official instructed the dock official to reject the cheese. The Schreiber official then phoned Swift's office in Springfield, stating that the cheese would have to be returned to Schreiber's plant in Carthage. Swift's operations manager communicated that directive to Ellison by phone, and Ellison drove back to Springfield with the cheese, arriving at Swift's office on August 30.

Swift's operations manager followed Ellison to Schreiber's plant in Carthage, where the cheese was inspected by Schreiber officials. They determined that the cheese, because of its condition, was not marketable, and would have to be "reprocessed" into new products. That was done at a cost to Schreiber of $25,868.68.

Schreiber, which had paid Swift $1,968 for hauling the cheese from Carthage to New Orleans and back, made demand on Swift for $27,836.68, the sum of Schreiber's reprocessing cost and shipping expense. Swift paid that amount to Schreiber in order "to continue to do business" with Schreiber. Swift then filed this suit against Swearengin and Ellison for indemnity.

Swift based its claim on paragraph 11 of the August 25 lease agreement. That paragraph provided, in pertinent part:

"... Contractor shall indemnify and hold Carrier harmless from any and all loss, theft, damage, liability, claim, cost or expense suffered or incurred to cargo...."

Although the lease agreement named Swearengin, alone, as the Contractor, Swift tried the case on the theory that the liabilities of Ellison and Swearengin were identical. The trial court made no distinction between Ellison and Swearengin, holding each liable for the full amount of damages awarded Swift. On appeal, Ellison makes no contention that, as to Swift, he stands in any different position than Swearengin.

■ The only challenge to the sufficiency of the evidence by Swearengin and Ellison (hereafter referred to collectively as "defendants") is that Swift failed to make a prima facie case under 49 U.S.C.A. § 20, para. 11 (West, 1951), in that there was no showing that the cheese was "originally delivered to the carrier in good condition."

Defendants' contention, as we understand it, is that under the cited federal statute, Swift would have no liability to Schreiber absent a showing that the cheese was in good condition when loaded into Swearengin's trailer on August 25. Defendants correctly note that under the federal statute, a shipper, in an action to recover from a carrier for damage to a shipment, makes a prima facie case when he shows delivery of the goods to the carrier in good condition, arrival in damaged condition, and the amount of damages. *Missouri Pacific Railroad Co. v. Elmore & Stahl,* 377 U.S. 134, 84 S.Ct. 1142, 1144–45[4], 12 L.Ed.2d 194 (1964). Defendants maintain that Swift failed to prove that the cheese was in good condition when loaded aboard

Swearengin's trailer at Carthage on August 25, therefore Swift failed to show that Schreiber had a valid claim against Swift. Absent that, say defendants, they have no duty to indemnify Swift.

Swift, in seeking indemnity from defendants, obviously recognized the necessity of showing that the cheese was in good condition when placed in Swearengin's trailer at Carthage on August 25. At trial, Swift undertook that task.

In that regard, the evidence established that when a trailer is backed into the loading position at Schreiber's plant in Carthage, there are "bags" around the loading dock which fit against the rear of the trailer. In Ellison's words, "You back up against those bags, and that holds it airtight."

Asked about the temperature at Schreiber's loading dock, Ellison responded that it was cool enough that "you should put a sweater or coat or something on."

The quality control manager at Schreiber's Carthage plant produced records showing that the cheese in question, prior to being loaded into Swearengin's trailer on August 25, had been stored under refrigeration at Schreiber's plant for several days, at temperatures ranging from 33.5 to 44 degrees. The witness added that although the temperature of the cheese was not measured by a thermometer when it was loaded, the records established that the temperature would have been between 38 and 44 degrees.

Defendants presented no evidence to the contrary. Indeed, Ellison testified that as soon as the cheese was loaded, he turned on the trailer's refrigeration unit, setting the temperature control at 40 degrees. Ellison recounted that after leaving Carthage, he drove about 15 miles, then stopped at a restaurant for coffee. Upon leaving the restaurant, Ellison looked at the thermometer showing the air temperature inside the trailer and noted it read 40 degrees. Ellison explained, "Whatever temperature the cheese was is what it would be inside the trailer."

The trial court found that at the time the cheese was placed inside the trailer at Schreiber's Carthage facility, the cheese was in good condition and ranged in temperature from 38 to 44 degrees. The evidence is sufficient to support that finding. Accordingly, we reject defendants' contention that there was no showing that the cheese was in "good condition" when loaded into Swearengin's trailer.

Defendants also contend that the cheese "could have been placed in storage for two days in New Orleans and cooled down to an acceptable temperature at a much lower cost." Asserting that a consignee has no right to abandon delivered property to a common carrier when the goods have a significant value, defendants maintain that the only amount Schreiber was entitled to recover from Swift was the cost of storing and cooling the cheese in New Orleans, therefore that is all the indemnity owed by defendants to Swift.

We disagree with defendants for two reasons. First, Schreiber's quality control manager testified that the condition of the cheese when it reached New Orleans was irreversible, that cooling it to its original temperature would not have restored it to marketable condition, and that reprocessing was the only means of salvage. Second, Schreiber did not abandon the cheese to Swift; instead, Schreiber took the affirmative step of ordering the cheese returned to its Carthage facility for reprocessing to mitigate damages. The cheese, when shipped on August 25, had been invoiced to Schreiber's customer in Puerto Rico for $61,063.06. By reprocessing the cheese, Schreiber held its loss to $27,836.68. There was no evidence of any other available method of lessening the loss.

The trial court properly rejected defendants' theory that if they owed Swift anything, it was only the cost of two days' cold storage in New Orleans.

Defendants' remaining point presents the only difficult issue on their appeal. The point states:

"The court erred in awarding judgment to [Swift] because the written lease

agreement between [Swift] and [defendants] is an illegal contract in that it violates provisions of 49 CFR 1057 by failing to meet the regulation's requirements for a written contract, by failing to specify any compensation, by allowing the owner-lessor's driver to operate the leased vehicle when the duration of the lease is for less than thirty days, and by failing to be an agreement between two authorized common carriers licensed by the I.C.C."

49 C.F.R. Part 1057, containing §§ 1057.1 to 1057.41 (1982), comprised the Interstate Commerce Commission regulations regarding lease and interchange of vehicles by motor carriers in effect on August 25, 1982.[2]

49 C.F.R. § 1057.11, a part of those regulations, set forth certain conditions which an authorized carrier had to meet in order to transport cargo in equipment the carrier did not own. Among the conditions was a requirement (49 C.F.R. § 1057.11(a)) that there be a written lease meeting the requirements listed in 49 C.F.R. § 1057.12.

Included in 49 C.F.R. § 1057.12 was a provision that the period for which the lease applied had to be for 30 days or more when the equipment was to be operated for the authorized carrier by the owner or an employee of the owner. 49 C.F.R. § 1057.12(c). Another provision required that the amount to be paid by the authorized carrier for equipment and driver's services be clearly stated on the face of the lease or in an addendum attached to the lease. 49 C.F.R. § 1057.12(e).

Defendants correctly point out that the lease agreement of August 25 between Swift and Swearengin was not for 30 days or more, but was instead a trip lease, defined by 49 C.F.R. § 1057.2(g) as a lease in which an authorized carrier acquires the use of equipment, with or without driver, from an owner for a period less than 30 days.

Defendants also correctly point out that the lease agreement of· August 25 did not state the amount to be paid by Swift for the use of Swearengin's tractor and trailer, and for Ellison's services as driver. In that regard, we note that the lease agreement was a printed form with sundry blanks to be filled in, so as to enable the form to be adapted to an infinite number of leasing arrangements. Among the blank spaces was one in which to insert the consideration to be paid by the Carrier to the Contractor for the use of the equipment and for the driver's services. That space, alone, was left blank when Ellison signed the lease at Swift's office on August 25.

It would thus appear, without further study, that because the lease was for fewer than 30 days, and because it failed to state the amount to be paid by Swift for the use of Swearengin's equipment and Ellison's services, it violated the regulations cited above.

However, Swift directs our attention to another segment of the regulations, Subpart C of 49 C.F.R. Part 1057, under which we find § 1057.22. That section provides that regardless of the leasing regulations in Part 1057, an authorized carrier may lease equipment to or from another authorized carrier under certain conditions. Swift aptly observes that although defendants, in their brief, proclaim that Swearengin is not licensed by the Interstate Commerce Commission as an authorized carrier, there is nothing in the record to support such an assertion. To the contrary, Swift correctly points out that the only evidence in the record on that subject is a provision in the August 25 lease agreement stating:

"Trip lease (exempt from 30 day minimum 49 C.F.R. 1057.3(a) authorized carrier Contractor)

1) Contractor certifies by execution hereof to be an authorized carrier under the provisions of Sections 206, 207 or 209 of the Interstate Commerce Act 49 U.S.C. 306, 307 or 309.

**2.** The regulations referred to in this opinion are those appearing in the revision effective November 1, 1982. Some sections have since been amended, and one section, § 1057.42, has been added.

...."

The above-quoted provision is consistent with an allegation in Swift's petition that Swearengin was "engaged in the business of transporting freight in interstate commerce as a common carrier." Defendants, in their answer, admitted that allegation.

■ Thus, so far as the record shows, the August 25 lease agreement was between two authorized carriers: Swearengin and Swift. Accordingly, we agree with Swift that the applicable regulation was 49 C.F.R. § 1057.22. That regulation, while requiring a written agreement (49 C.F.R. § 1057.22(e)), did not require that the period of the lease be 30 days or more, nor did it require that the amount to be paid by the carrier for the use of the equipment and the driver's services be stated on the face of the lease.

Defendants do not contend that the August 25 lease agreement violated any provision of 49 C.F.R. § 1057.22; consequently, we reject defendants' contention that the lease "violates ICC regulations" and "is therefore null, void and unenforceable."

■ Having made that determination, we are still confronted by the fact that the consideration to be paid by Swift to Swearengin for use of the equipment and Ellison's services as driver was not shown in the lease agreement. Does that omission render the agreement invalid under general contract law, thereby defeating enforcement of the indemnity clause?

In pondering that question, we note that there was no dispute about the amount defendants were to receive for hauling the cheese from Carthage to New Orleans. Ellison testified that he learned the haul was available by phoning Swift's Springfield office. Ellison was told, during the call, what Swift would pay ($787.20). After the call, Ellison located Swearengin, who "was out on a job." Ellison told Swearengin how much Swift would pay, and inquired whether Swearengin wanted him to make the haul. Asked how Swearengin responded, Ellison testified: "He said yeah, and he said it would be all right. He said, 'Just make sure you watch your count on the boxes down there.' "

Ellison then went to Swift's office and signed the lease agreement, after which he drove the tractor-trailer unit to Carthage, where the cheese was loaded.

Swift's operations manager confirmed that Ellison was told that the payment for hauling the cheese would be $787.20. The operations manager identified a freight bill prepared in connection with the haul, pointing out that the bill showed that the payment would be $787.20. The bill also showed that Ellison received "advances" from Swift totaling $350, and that Ellison also received a "dial-a-check" on August 29 (en route back from New Orleans) for $153.

The trial court found that prior to Ellison's signing the lease, he and Swearengin knew Swift would pay $787.20 for the haul. The above evidence fully supports that finding, and defendants do not claim otherwise.

We thus have a situation where (a) all of the terms of the agreement were reduced to writing except the amount Swift was to pay defendants, and (b) despite that omission, all parties knew, prior to the signing of the lease agreement, what the payment would be. In these circumstances, does the failure of the written lease agreement to show the amount to be paid render the agreement invalid?

The closest Missouri case we find on that issue is *Willman v. Beheler*, 499 S.W.2d 770 (Mo.1973). There, an established physician in St. Joseph entered into a partnership agreement with a younger physician. One of the provisions specified that if the latter left the partnership voluntarily or involuntarily, he would not practice medicine for five years within 20 miles of St. Joseph. There were numerous other provisions, one of which pertained to the respective rights of the parties to the accounts receivable if a partner voluntarily left the partnership. Certain blanks in this provision were never filled in, as the parties never agreed on the matter.

The partners were not compatible, and after 18 months the senior physician notified the junior physician that the partnership was terminated. Ignoring the restrictive covenant, the junior physician continued to practice medicine in St. Joseph, whereupon the senior physician filed suit for injunctive relief. The junior physician counterclaimed for monies allegedly due him, including his share of the accounts receivable.

The Supreme Court held that the provision forbidding the junior physician from practicing medicine within the restricted area for five years was enforceable. *Id.* at 777. Regarding the rights in the accounts receivable, the Supreme Court stated that where blanks are left in a written instrument and not filled in, the agreement is uncertain and incomplete, and there is no meeting of the minds. *Id.* at 779[26]. That, however, did not render the entire agreement invalid or prevent enforcement of the covenant forbidding the junior physician from practicing in the restricted area.

In seeking enforcement of the indemnity clause (paragraph 11 of the lease agreement) in the instant case, Swift occupies a stronger position than the senior physician in *Willman,* in that here, there is no dispute as to what would have appeared in the blank had it been filled in. As heretofore explained, all parties understood that Swift was to pay $787.20 for the use of Swearengin's tractor-trailer unit and Ellison's services as driver. In *Willman,* there was never any agreement as to what should appear in the blanks.

On the authority of *Willman,* we hold that, in the circumstances here, the failure to fill in the blank in the lease agreement where the amount to be paid by Swift should have been shown did not render the agreement invalid or prevent enforcement of the indemnity clause.

Having found no merit in any of defendants' attacks on the judgment, we deny their appeal (number 14102), and affirm that portion of the judgment awarding Swift damages of $27,836.68 against defendants.

We now turn to Swift's appeal (number 14109), noting that defendants, as respondents in that appeal, filed no brief answering the two assignments of error asserted by Swift.

■ Swift's first assignment of error is that the trial court wrongly denied Swift's prayer for attorney fees and expenses. Swift based its claim for those items on paragraph 14 of the lease agreement, which stated:

"In the event of a breach of the terms and provisions of this Trip Lease, the non-breaching party shall be entitled to reimbursement of all of its costs and expenses in enforcing this Trip Lease, including reasonable attorneys' fees."

Swift presented evidence that as of the day preceding the start of the trial, it had incurred attorney fees of $3,465 and expenses of $1,861.55 in attempting to enforce the indemnity clause against defendants. The trial consumed three days and part of a fourth. Final arguments were presented on yet another day. Additionally, Swift's counsel, after trial, filed amended pleadings and written suggestions. We find no evidence in the record as to the attorney fees or expenses incurred by Swift after trial began, and Swift, in its brief, does not direct our attention to any such evidence.

The trial court found that Swift had incurred reasonable and necessary attorney fees, costs, and expenses totaling $8,377.72. Despite that finding, the trial court awarded Swift no attorney fees or expenses. The trial court did, however, tax the costs against defendants, and we note that some of the $1,861.55 expenses listed by Swift were for depositions, which would be included in the costs taxed against defendants. Rule 57.10(a), Missouri Rules of Civil Procedure (15th ed. 1984).

We hold that under paragraph 14 of the lease agreement, Swift was entitled to its costs and expenses incurred in enforcing the indemnity clause, including reasonable attorneys' fees. If there were evidence sufficient to support the trial court's find-

ing that Swift's reasonable and necessary attorney fees, costs and expenses totaled $8,377.72, we could consider exercising our power under Rule 84.14, Missouri Rules of Civil Procedure (17th ed. 1986) to modify the judgment by awarding Swift that amount. However, as explained above, there is no evidence supporting an award in that sum, even though it is obvious that Swift incurred more attorneys' fees than the $3,465 which had accrued up to trial.

In these circumstances, the proper course is to reverse that portion of the judgment denying Swift's prayer for attorney fees and expenses, and to remand the cause to the trial court for entry of an award of such fees and expenses as the trial court deems proper. In making the award, the trial court should identify the deposition expenses incurred by Swift that are taxable as costs, thereby ensuring that those items are not included in the expense award.

■ Swift's other assignment of error is that the trial court wrongly ruled that interest on the $27,836.68 damages awarded Swift should run from the date of judgment (November 30, 1984), instead of from September 28, 1982, the date Swift sent a letter to Swearengin demanding $27,836.68 indemnity. Swift insists that under § 408.020, Laws 1979, p. 566, it was entitled to interest at nine per cent per annum on said sum from the date of the demand.

In *Fohn v. Title Insurance Corp. of St. Louis*, 529 S.W.2d 1, 5[7, 8] (Mo. banc 1975), the Supreme Court of Missouri set aside an award of pre-judgment interest, stating that where the claim is unliquidated, the person liable does not know the amount he owes, and should therefore not be considered in default because of failure to pay.

In the instant case, defendants denied liability on the ground that there was no showing that the cheese was in good condition and properly cooled at the time it was loaded into Swearengin's trailer. Ellison's testimony, had the trial court found it credible, would have tended to establish that the temperature in the trailer, throughout the journey to New Orleans, was maintained at 40 degrees, thereby supporting an inference that the fat component in the cheese had already begun to liquefy before the cheese was placed in the trailer on August 25. Additionally, defendants claimed that the indemnity clause was unenforceable because the lease agreement was invalid, in that it failed to comply with applicable Interstate Commerce Commission regulations. Although we have rejected that contention, it undeniably presented a justiciable issue.

Moreover, Swift's claim against defendants was unliquidated until the trial court assessed damages. While Swift maintained from the start that the cheese could not have been restored to marketable condition by placing it in cold storage in New Orleans, that issue was not resolved in Swift's favor until the trial court so found. Defendants unsuccessfully attempted to persuade the trial court that two days' cold storage would have restored the cheese to marketable condition.

We have studied the cases cited by Swift in support of its claim for pre-judgment interest, but in our view, given the circumstances of the instant case, the rule in *Fohn* controls. Accordingly, we hold that the trial court did not err in refusing to award Swift pre-judgment interest.

That portion of the judgment denying Swift's prayer for attorneys' fees and expenses is reversed, and the cause is remanded to the trial court for the sole purpose of entry of an award of such attorneys' fees and expenses as the trial court finds proper under the evidence. When awarded, the attorneys' fees and expenses shall bear interest at the rate specified in § 408.040, Laws 1979, p. 580, from the date of the award. In all other respects, the judgment is affirmed.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.