# United States Court of Appeals

### For the Eighth Circuit

_____

No. 15-2307

_____

Barkley, Inc.

*Plaintiff - Appellant*

v.

Gabriel Brothers, Inc.; Rugged Wearhouse, Inc.

*Defendants - Appellees*

_____

No. 15-2308

_____

Barkley, Inc.

*Plaintiff - Appellee*

v.

Gabriel Brothers, Inc.; Rugged Wearhouse, Inc.

*Defendants - Appellants*

_____

Appeals from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: January 13, 2016
Filed: July 25, 2016
_____

Before WOLLMAN, MELLOY, and COLLOTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Gabriel Brothers, Inc. and Rugged Wearhouse, Inc. (Gabriel Brothers), two commonly owned discount clothing and apparel chains that are headquartered in West Virginia, entered into a master services agreement (the Agreement) with Barkley, Inc. (Barkley), a marketing company located in Missouri, for marketing and advertising services. The Agreement provided the general terms governing the companies' relationship, while the specific services and fees were to be negotiated later as project-specific contracts, called statements of work. The Agreement permitted either party to terminate the contract after providing 90 days' notice. Gabriel Brothers terminated the Agreement before a written 2013 statement of work had been executed, but after Barkley had begun work on 2013 projects.

Barkley sued, claiming that Gabriel Brothers breached the Agreement or, in the alternative, that Gabriel Brothers breached a subsequent agreement to pay "actual costs" and that Gabriel Brothers was unjustly enriched. Gabriel Brothers filed counterclaims, alleging that Barkley breached the Agreement and that Barkley was unjustly enriched by Gabriel Brothers's partial payment of the amount for which Barkley had submitted invoices. The district court granted summary judgment in favor of Gabriel Brothers on Barkley's claim that Gabriel Brothers breached the Agreement, and a jury awarded damages to Barkley on its actual-costs claim. As relevant here, the district court denied Barkley's post-trial motion for prejudgment

interest and Gabriel Brothers's motions for judgment as a matter of law or, in the alternative, a new trial, and for attorney's fees.

Barkley appeals from the district court's grant of summary judgment to Gabriel Brothers on Barkley's breach-of-the-Agreement claim, as well as from the court's denial of prejudgment interest on the jury award. Gabriel Brothers cross-appeals from the district court's alleged *sua sponte* grant of partial summary judgment to Barkley, in which it concluded that the parties had formed a separation-agreement contract. Gabriel Brothers also appeals from the district court's evidentiary rulings and jury instructions, the district court's denial of Gabriel Brothers's post-trial motions for judgment as a matter of law or for a new trial, and the district court's order denying attorney's fees. We reverse the district court's order denying prejudgment interest and affirm in all other respects.

## I. Background

Gabriel Brothers hired Barkley in September 2012 to be its advertising agent for a term of eighteen months. Gabriel Brothers and Barkley entered into the Agreement in October 2012 and made its terms retroactive to September. The Agreement provided the general terms for the relationship between the two companies, and subsequent statements of work would specify the projects that Barkley would complete and the fees that Gabriel Brothers would pay. The Agreement contained an incorporation clause, which stated:

> Barkley shall perform for [Gabriel Brothers] certain services which shall be agreed to by the parties on a project-by-project basis . . . . The Services agreed to for each Project shall be designated in a written Statement of Work ("Statement of Work"). Each Statement of Work shall contain the following provision:

"This Statement of Work is incorporated into, and made a part of, that certain Master Services Agreement . . . between the parties dated [October 5,] 2012, which Agreement governs the relationship of the parties. All terms and conditions provided in the Agreement shall apply to this Statement of Work."

The Agreement also contained the following termination clause: "Either party may terminate this Agreement at any time and without cause with ninety (90) days written notice to the other party. Termination in this manner shall not affect any Projects then in effect." Finally, the Agreement entitled the prevailing party in any future lawsuit to recover attorney's fees, if the litigation was initiated "to construe or enforce this Agreement."

In November 2012, Barkley and Gabriel Brothers executed a statement of work (2012 statement) that covered the time period of September 2012 through December 25, 2012. In December 2012, Barkley began working on projects that were not included in the 2012 statement, but were undertaken at Gabriel Brothers's request while the companies negotiated a statement of work for 2013.

On January 31, 2013, representatives from the companies discussed a statement of work for 2013. Barkley presented its proposed budget, and Gabriel Brothers described its marketing plans for 2013, explaining that its "budgets [were] very tight." Barkley agreed to submit a "revised staffing plan."

On February 13, 2013, Dan Fromm, Barkley's President and Chief Operations Officer, sent an email to Richard Pesce, Gabriel Brothers's Senior Vice President, Operations, with the subject "Follow Up" and a document attached that was titled "2013 Gabes SOW (1).pdf" (draft 2013 statement of work). In the email, Fromm referred to a conversation that he had had with Pesce one week earlier and explained that the attachment was a "revised budget proposal" based on that conversation. The email stated that under the revised proposal, "the fee will drop to $58,333.33 per month (Feb-Dec)," and that "[w]e have tightened our fees to work with your budget,

and feel we can accomplish this with a disciplined approach to the pre-scheduled events."

The draft 2013 statement of work included three tiers of services. The first tier (Tier 1) listed the services that Barkley would provide for Gabriel Brothers's planned marketing events under the $58,333.33 monthly fee. The list of services was not complete on February 13, 2013, however, and indicated that the Tier 1 services Barkley would provide later in the year were yet to be determined. The second tier (Tier 2) listed services that were not covered by the monthly fee but which Barkley would provide at Gabriel Brothers's request. The fees associated with each Tier 2 service were set forth in the draft 2013 statement of work. The third tier (Tier 3) included services that were to be negotiated on a project-by-project basis because they were of a "greater scale" than the Tier 2 services. Fromm's email concluded, "We would like to set up a call to walk through the attachment together and get our agreement finalized."

Pesce responded later that day, writing, "Thank you for providing this proposal, this is more in-line with our needs. As I mentioned last week we were able to put fabric on the skeleton for the second half and we're now finished (attached)." Pesce's email included an attached document titled "2013 Marketing_MediaStrategy_Updated 2 12 13.xlsx," which outlined Gabriel Brothers's schedule of planned marketing events for the second half of 2013. Pesce indicated that the companies were nearing a final agreement, and a February 21, 2013, conference call was scheduled so that the companies could discuss Gabriel Brothers's updated schedule and Barkley's draft 2013 statement of work.

Jerrod Mitchell, Barkley's Account Supervisor for the Gabriel Brothers account, sent a pre-call email with a revised draft 2013 statement of work that included the projects listed in Gabriel Brothers's marketing schedule to Fromm, Pesce, and others involved with the negotiations. The email stated that the "[updated]

-5-

budget now includes all of the latest information that has been provided to [Barkley] on upcoming work for the year."

Following the conference call, Mitchell sent an email expressing his "excite[ment] about the progress that was made and . . . [his] confiden[ce that] this will set us up for a successful partnership in 2013." Mitchell outlined the "next steps" that the companies planned to take, as he understood them from the information shared during the call. Those steps included verifying the accuracy of the list of projects set forth under Tier 1, updating the prices and services set forth under Tier 2, and adding more information about the services that would be included under Tier 3.

On March 1, 2013, Barkley sent an email to Gabriel Brothers with the subject "Updated 2013 Gabes SOW." Attached to the email was a revised draft 2013 statement of work that reflected the changes Mitchell had outlined. That draft included changes to Tiers 2 and 3, while Tier 1 remained unchanged and listed the same $58,333.33 monthly fee that Fromm had proposed in the first draft 2013 statement of work. The email concluded, "If you feel good about this, we will get a contract drafted so we can get this finalized and keep moving on our events."

On March 7, Staci Strickler Shane, Gabriel Brothers's Director of Customer Experience and Mitchell's primary contact, requested that additional services be added to Tier 1. The following day, Mitchell sent Strickler Shane a revised draft 2013 statement of work, which added the services Strickler Shane had requested and increased the monthly fee to $60,000. Mitchell's email concluded, "Please let me know if you have any questions on these changes. I am hopeful we can get this approved soon." He further noted that "I am starting to draft the contract now based on this latest agreement. Once it is finished, we will send it over to you for final approval." Strickler Shane did not respond to Mitchell's email.

On March 19, Gabriel Brothers notified Barkley that it was terminating Barkley's services, to "bring marketing communications in house and to begin that process at once." The parties never drafted a contract for the draft 2013 statement of work that included the Agreement's incorporation clause.

Fromm sent an email to Pesce the same day, noting that he had been "caught off guard" by Gabriel Brothers's decision. He wrote:

> While we obviously didn't have a signed agreement in place, we were working in good faith to run things according to the scope we had agreed to in principle. That means we've got people dedicated to your account in order to keep up with the workload, some of whom we've just recently hired. In a standard client agreement, we would have a 90-day termination clause. That is in place to allow for effective transition as well as to allow us to either re-deploy the team or give them a reasonable notice period upon termination.

Fromm asked, "Would you consider an extension to the notice? Even an extra 30 days would help us provide the team a little bit of severance. Honestly, if I want them to work for the next two weeks on a transition, I think we need at least that much."

Fromm thereafter entered into negotiations with Ken Seipel, Gabriel Brothers's Chief Executive Officer, and Lori Paletta-Davis, Gabriel Brothers's General Counsel, over a potential separation agreement. On March 27, Fromm informed Paletta-Davis, "We are more than happy to simply have Gabriel Brothers pay us for the work that we have done this year (and continue to do) up through the time that all of the assets are transferred over." He added, "If you agree, we will send over a new invoice for [January] and [February] and should be able to get a final bill based on March time to you by the end of next week." On April 3, Paletta-Davis requested invoices from Barkley, noting, "The key then is for you to get the invoices to us as soon as possible. Everything will hinge on that."

On April 5, Fromm spoke with Seipel on the phone and proposed an agreement under which Gabriel Brothers would pay Barkley's actual costs. Seipel agreed, and Fromm submitted more than two hundred pages of invoices that set forth fees of $418,996.76. This amount included fees owed to third-party vendors. The invoices set forth the fees associated with each project, but did not list the number of hours worked or the hourly rate charged for the services. Fromm also offered to "prepare a simple separation agreement . . . to include us waiving any additional fees for separation and to appropriately transfer creative rights."

Gabriel Brothers questioned the invoices, asserting that some of the charges were for services that Gabriel Brothers had not requested and that others constituted double billing. On April 24, at Strickler Shane's request, Mitchell submitted documents that provided additional information about the invoices. After reviewing the invoices and additional materials Mitchell had sent, Gabriel Brothers continued to dispute the invoices and requested more documentation verifying the charges, including a spreadsheet that provided more details about the items set forth in the invoices. When Barkley did not provide that information, Gabriel Brothers identified those line items that it determined had not been requested or were not attributable to any particular project. Ultimately, Gabriel Brothers paid the third-party vendors directly and paid Barkley $228,677.13. In total, Gabriel Brothers refused to pay $138,223.52 of the invoiced amount.

Barkley sued, alleging breach of the Agreement and, in the alternative, breach of the April 5 agreement to pay "actual costs" and unjust enrichment. Gabriel Brothers counterclaimed, alleging breach of the Agreement and unjust enrichment. Gabriel Brothers also asserted several affirmative defenses, including accord and satisfaction.

As set forth earlier, the district court granted Gabriel Brothers's motion for summary judgment in part and dismissed the claim that Gabriel Brothers had

breached the Agreement. In denying summary judgment on Barkley's claim that Gabriel Brothers had breached the April 5 agreement, the district court noted, "In this case, there was an agreement that Gabriel Brothers would pay Barkley's 'actual costs.'" Although Barkley had not moved for summary judgment on that claim and the district court's order merely denied Gabriel Brothers summary judgment on the claim, the evidence at trial and the jury instructions were limited to whether Gabriel Brothers breached the actual-costs agreement and the amount of damages, if any, that Gabriel Brothers owed to Barkley.

Before the case was submitted to the jury, the district court determined that no evidence supported Gabriel Brothers's counterclaims or its accord-and-satisfaction defense and accordingly rejected Gabriel Brothers's proposed jury instructions on those issues.

Based on its conclusion that the focus of the trial would be the amount of the actual costs that Gabriel Brothers owed to Barkley, the district court granted in part Barkley's motions in limine to exclude testimony from Timothy Hanlon, Gabriel Brothers's expert witness, and Shari Rudolph, its corporate representative, who had been hired as Vice President and Chief Marketing Officer in January 2014.

The jury awarded Barkley $138,223.52 in damages. Both parties filed post-trial motions. Barkley moved for prejudgment interest. Gabriel Brothers moved for judgment as a matter of law or, in the alternative, for a new trial. It also moved to alter or amend the summary judgment ruling, arguing that the district court improperly granted summary judgment *sua sponte* to Barkley on the formation of an actual-costs contract. Gabriel Brothers requested attorney's fees. The district court denied the motions, and this appeal followed.

II. Barkley's Appeal

A. Summary Judgment

Barkley argues that the district court erred in granting summary judgment against it on its claim that Gabriel Brothers breached the Agreement, because Barkley had presented sufficient evidence for a reasonable jury to conclude that the companies had formed a 2013 statement of work on February 21, 2013. We review *de novo* a district court's grant of summary judgment, viewing the evidence "in the light most favorable to the nonmoving party."[1] Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655, 39 F.3d 191, 194 (8th Cir. 1994). In a diversity action, we apply state substantive law and federal procedural law. See FutureFuel Chem. Co. v. Lonza, Inc., 756 F.3d 641, 646 (8th Cir. 2014) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). The parties agree that Missouri law controls in this case.

Barkley argues that the Agreement did not condition the formation of a statement of work on the execution of a formal contract, but merely contemplated that

---

[1]Gabriel Brothers argues that Barkley failed to preserve its appeal of the summary judgment order because Barkley did not file post-trial motions under Federal Rules of Civil Procedure 50, 59, or 60. The requirement that a party preserve arguments raised at summary judgment "through subsequent motions for judgment as a matter of law" applies, however, only to "argument[s] denied at summary judgment." N.Y. Marine & Gen. Ins. Co. v. Cont'l Cement Co., 761 F.3d 830, 838 (8th Cir. 2014) (quoting White Consol. Indus., Inc. v. McGill Mfg. Co., 165 F.3d 1185, 1189 (8th Cir. 1999)). Barkley's appeal addresses an adverse grant of summary judgment, and it raises the same arguments here that it raised at summary judgment, and so we conclude that it has preserved its arguments. Cf. Eagle Technology v. Expander Americas, Inc., 783 F.3d 1131, 1138 n.3 (8th Cir. 2015) (declining to consider an argument raised for the first time on appeal because the plaintiff had not raised the argument in response to the defendant's motion for summary judgment or in any post-trial motions).

any statement of work would eventually be reduced to a writing and would include the incorporation clause. The interpretation of a contract is a question of law. Crestwood Shops, L.L.C. v. Hilkene, 197 S.W.3d 641, 648 (Mo. Ct. App. 2006). "When interpreting a contract, the overriding concern of the appellate court is to give effect to the intentions of the parties." Id. In determining the intentions of the parties, "the court first looks to the plain language of the agreement." See TAP Pharm. Prods. Inc. v. State Bd. of Pharmacy, 238 S.W.3d 140, 143 (Mo. 2007) (en banc). The Agreement states that "[t]he services agreed to for each Project shall be designated in a written Statement of Work" and that "[e]ach Statement of Work shall contain" the Agreement's incorporation clause. The use of the word "shall" indicates that a written statement of work is required and that any statement of work must contain the incorporation clause. Accordingly, because the alleged February 21, 2013, draft 2013 statement of work was not part of a written contract and the document did not contain the Agreement's incorporation clause, the district court did not err in granting summary judgment to Gabriel Brothers on Barkley's breach-of-the-Agreement claim.

## B. Prejudgment Interest

Barkley argues that the district court improperly denied prejudgment interest. Under Missouri Revised Statutes, section 408.020, "Creditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, . . . and on accounts after they become due and demand of payment is made." Missouri courts award prejudgment interest if three elements are met: "(1) the expenses must be due; (2) the claim must be liquidated or the amount of the claim reasonably ascertainable; and (3) the obligee must make a demand on the obligor for the amount due." Jablonski v. Barton Mut. Ins. Co., 291 S.W.3d 345, 350 (Mo. Ct. App. 2009). "We review the statutory right to prejudgment interest pursuant to section 408.020 de novo." Mitchell v. Residential Funding Corp., 334 S.W.3d 477, 508 (Mo. Ct. App. 2010). "Interest

has traditionally been used to compensate for the use of or loss of use of money to which a person is entitled." Travelers Prop. Cas. Ins. Co. of Am. v. Nat'l Union Ins. Co. of Pittsburgh, Pa., 735 F.3d 993, 1004-05 (8th Cir. 2013) (quoting Catron v. Columbia Mut. Ins. Co., 723 S.W.2d 5, 7 (Mo. 1987) (en banc)). The denial of prejudgment interest for unliquidated claims "is based, generally, on the idea that where the person liable does not know the amount he owes he should not be considered in default because of failure to pay." Fohn v. Title Ins. Corp. of St. Louis, 529 S.W.2d 1, 5 (Mo. 1975) (en banc). The district court denied prejudgment interest on the ground that the claim was neither liquidated nor reasonably ascertainable in amount. The parties agree that the other elements are satisfied.

In denying prejudgment interest to Barkley, the district court relied on the Missouri Court of Appeals's statement in Children International v. Ammon Painting Co., 215 S.W.3d 194, 205 (Mo. Ct. App. 2006), that "[a] *bona fide* dispute as to the amount of damages owed will result in the damages being classified as unliquidated." The district court thus concluded that because the amount of damages "was a legitimately disputed issue between the parties that ultimately required a jury to determine the amount left owing to Barkley," prejudgment interest was not appropriate. Missouri's case law, however, indicates some tension over whether a dispute over the amount of damages—as opposed to disputes over liability or the method used to calculate damages—precludes prejudgment interest. Compare Comens v. SSM St. Charles Clinic Med. Grp., Inc., 335 S.W.3d 76, 82 (Mo. Ct. App. 2011) ("The mere fact that a party denies liability or defends a claim against [it], or even the existence of a *bona fide* dispute as to the amount of the indebtedness, does not preclude recovery of interest." (quoting Columbia Mut. Ins. Co. v. Long, 258 S.W.3d 469, 480 (Mo. Ct. App. 2008))) with Children Int'l, 215 S.W.3d at 205.

The facts of Children International are distinguishable, for that case involved a claim for outsourcing costs, the benefits of which were "variable, speculative, and uncertain," and the estimate of which was prospective in nature. Children Int'l, 215

-12-

S.W.3d at 204. Unlike in <u>Children International</u>, Barkley's invoices were not prospective or based on estimates. And while Gabriel Brothers raised an accord-and-satisfaction defense, the district court entered judgment as a matter of law rejecting that defense, concluding that the evidence did not justify submitting the issue to the jury.

Missouri courts have held that damages claims are not liquidated when the method used to calculate damages was a genuinely disputed issue. <u>See</u> <u>Fohn</u>, 529 S.W.2d at 4, 5 (concluding that a claim for the diminished value of property was unliquidated where the proper measure of damages was a question "of first impression" in the state); <u>see also</u> <u>Ritter Landscaping, Inc. v. Meeks</u>, 950 S.W.2d 495, 497 (Mo. Ct. App. 1997) (noting that the parties disputed liability, as well as "the amount of damages to be applied and the method used to calculate those damages"). Missouri courts have also held damages claims to be unliquidated where the resolution of a claim or defense is necessary before damages can be calculated, as is true in the case of a failure-to-mitigate defense, or when the jury decides whether goods are salvageable. <u>See</u> <u>Children Int'l</u>, 215 S.W.3d at 205 (failure-to-mitigate defense); <u>Swift Transp. Co. v. Swearengin</u>, 709 S.W.2d 130, 137 (Mo. Ct. App. 1986) (noting that whether cheese could "have been restored to marketable condition by placing it in cold storage" had to be resolved before damages could be calculated). But Missouri courts have granted prejudgment interest despite a dispute over the measure of damages, where the alternative measures offered by the defendant were not supported by evidence at trial, <u>Comens</u>, 335 S.W.3d at 81-82 (noting that the defendant's arguments for alternative measures of damages were unsupported by evidence); where the amount of damages was disputed but the parties agreed on the proper method for calculating damages, <u>McNeill v. City of Kansas City</u>, 459 S.W.3d 509, 517 (Mo. Ct. App. 2015) (fair-market value); and where the parties disputed liability but the amount of damages was "readily determinable and ascertainable by simple computation," <u>Watters v. Travel Guard Int'l</u>, 136 S.W.3d 100, 104-05, 111 (Mo. Ct. App. 2004); <u>see also</u> <u>Travelers Prop. Cas. Ins. Co. of Am.</u>, 735 F.3d at 1006-

-13-

07 (concluding that prejudgment interest was available where "there was no uncertainty surrounding the amount of [the] claim," "[n]o uncertain measurements of damage existed and no framework for assessing liability or calculating damages was missing," and "this case involved a run-of-the-mill liability dispute").

Here, Barkley made a fixed demand for payment, and the method used to calculate damages was never in dispute; both parties agreed that the proper measure was the number of hours worked multiplied by the hourly rate. As earlier recounted, the district court dismissed Gabriel Brothers's accord-and-satisfaction defense, along with its two counterclaims because they were unsupported by the evidence. And although the jury was given both liability and amount-of-damages instructions, Gabriel Brothers's evidence and arguments at trial were that Barkley was not entitled to damages because its invoices did not include information about hours and rates, because Barkley charged for work it had not performed to Gabriel Brothers's satisfaction, and because the invoices included work that Gabriel Brothers had not requested. In other words, Gabriel Brothers disputed whether it had breached the agreement to pay actual costs, which, because they were determinable and ascertainable by simple calculation, were liquidated, thus entitling Barkley to prejudgment interest.

Accordingly, we hold that Barkley's damages claim was liquidated and that the district court should have awarded prejudgment interest.

III. Gabriel Brothers's Cross-Appeal

A. *Sua Sponte* Summary Judgment

Gabriel Brothers's first cross-appeal claim is that the district court erroneously granted partial summary judgment in Barkley's favor on the actual-costs contract claim, notwithstanding the absence of any motion by Barkley for such relief.

Although the summary judgment order denied Gabriel Brothers's motion, the district court stated:

> In this case, there was an agreement that Gabriel Brothers would pay Barkley's "actual costs." Keeping in mind that every agreement is overlain with implied duties of good faith and fair dealing, the Court concludes that there is a legitimate jury question as to the exact amount of what Barkley's "actual costs" were, and whether Gabriel Brothers' partial payment covered such costs (*i.e.*, whether Gabriel Brothers in fact breached any agreement to pay actual costs).

Thereafter, the district court limited the evidence at trial and the jury instructions to whether Gabriel Brothers had breached the actual-costs contract and the amount of damages, if any, resulting therefrom. Following the trial, Gabriel Brothers moved to amend the summary judgment order, arguing that it was entitled to present facts showing that there was a genuine dispute over whether the parties reached an agreement to pay actual costs. The district court rejected Gabriel Brothers's interpretation of its order:

> Gabriel Brothers reads the Court's language as making a final determination that there was an agreement reached between the parties on April 5, 2013. To the contrary, the Court—in response to Gabriel Brothers' argument that there was no meeting of [the] minds—found that there was evidence of a meeting of the minds sufficient to defeat a motion for summary judgment. . . . If Gabriel Brothers chose to be bound [by] the language of the summary judgment order in . . . its presentation of evidence, jury argument, and instructions, that was its litigation strategy.

The court and the parties treated the actual-costs issue as if it had been settled. For example, Gabriel Brothers submitted proposed preliminary jury instructions that stated, "The Court has determined the parties formed an agreement that called for Defendants to pay Plaintiff for services that Plaintiff furnished Defendants at

-15-

Defendants' request, from January 2013 through March 2013." It did not propose an instruction on whether the parties had reached an agreement for Gabriel Brothers to pay Barkley's actual costs.

Gabriel Brothers argues that the district court procedurally erred when it, in effect, decided to enter summary judgment on the actual-costs contract-formation issue without providing Gabriel Brothers with sufficient notice and an opportunity to respond. "Federal district courts have power to grant summary judgment *sua sponte* when the losing party is given sufficient advance notice and an adequate opportunity to submit evidence in opposition." Chrysler Credit Corp. v. Cathey, 977 F.2d 447, 449 (8th Cir. 1992) (per curiam); see also Fed. R. Civ. P. 56(f). Gabriel Brothers raised the actual-costs contract-formation issue in its own motion for summary judgment and presented its evidence at that time. The arguments that Gabriel Brothers now asserts it would have made to establish that there was a genuine dispute are the same arguments that it raised before the district court in its own motion for summary judgment. Assuming that the district court's statement constituted a *sua sponte* summary judgment on the actual-costs contract claim, we conclude that Gabriel Brothers was given adequate notice and that the district court therefore did not err in ruling as it did. See Am. Red Cross v. Cmty. Blood Ctr. of the Ozarks, 257 F.3d 859, 863 (8th Cir. 2001) (reversing where "[t]he district court in effect granted . . . summary judgment *sua sponte*, because the three claims [decided in the summary judgment order] were never raised" in the defendant's motion).

## B. Evidentiary Rulings and Jury Instructions

We review a district court's evidentiary rulings "for clear abuse of discretion, and reverse[] 'only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict.'" Am. Bank of St. Paul v. TD Bank, N.A., 713 F.3d 455, 464 (8th Cir. 2013) (quoting Chism v. CNH Am. LLC, 638 F.3d 637, 640 (8th Cir. 2011)). We review the district court's jury

instructions for abuse of discretion. <u>Graham Constr. Servs., Inc. v. Hammer & Steel Inc.</u>, 755 F.3d 611, 618 (8th Cir. 2014).

Gabriel Brothers argues the district court abused its discretion by excluding testimony of its expert witness, Tim Hanlon, who would have testified about the "value and reasonableness" of Barkley's services and "the reasonable practices by which that value should be demonstrated." The district court excluded Hanlon's testimony, noting that "the issue before the jury is not whether Gabriel [Brothers] was justified in not paying these invoices at the time they received them," but rather whether Barkley had actually provided the services for which it charged Gabriel Brothers. Given that narrow question, the district court concluded that the only expert opinion that Hanlon could offer the jury involved "industry standard[s] and practice[s] in terms of preparing an invoice" and what invoices look like, which the court concluded would not be helpful to the jury, and that the testimony was therefore irrelevant. The district court did not abuse its discretion in so holding.

Gabriel Brothers argues that the district court abused its discretion by excluding testimony from Shari Rudolph, its corporate representative. Having reviewed the argument we conclude that it does not merit further discussion, for we are satisfied that the district court's decision to limit Rudolph's testimony as it did was not an abuse of discretion.

Gabriel Brothers argues that the district court improperly excluded its proposed jury instructions. "In reviewing instructions, this court must determine whether the instructions, 'taken as a whole and viewed in light of the evidence and the applicable law, fairly and adequately submitted the issues in the case to the jury.'" <u>Fogelbach v. Wal-Mart Stores, Inc.</u>, 270 F.3d 696, 699 (8th Cir. 2001) (quoting <u>B & B Hardware, Inc. v. Hargis Indus., Inc.</u>, 252 F.3d 1010, 1012 (8th Cir. 2001)). Having reviewed the instructions as given by the district court, we conclude that they

satisfied this standard of review and that the district court did not err in excluding the proposed instructions.

## C. Motions for Judgment as a Matter of Law and for a New Trial

We review *de novo* a district court's denial of a motion for judgment as a matter of law, viewing the evidence in the light most favorable to the verdict. Estate of Pepper v. Whitehead, 780 F.3d 856, 861 (8th Cir. 2015). We review a motion for a new trial for abuse of discretion. Id.

Gabriel Brothers contends that Barkley failed to present evidence sufficient for a reasonable jury to find that the parties had entered into an actual-costs contract. Under Missouri law, a contract requires "mutuality of agreement" among the contracting parties over the contract's essential terms. See Ketcherside v. McLane, 118 S.W.3d 631, 635-36 (Mo. Ct. App. 2003) ("Mutuality of agreement is determined by looking to the intentions of the parties as expressed or manifested in their words or acts."). Fromm testified that he and Seipel agreed on April 5, 2013, that Gabriel Brothers would pay Barkley's actual costs, which both parties understood to mean Barkley's actual hours worked on projects for Gabriel Brothers. Barkley also presented evidence that Barkley sent invoices to Seipel on that same day and that Seipel sent an email on April 16, 2013, stating, "Dan and I have agreed we are paying for actual costs versus the monthly fee, and he will waive the cancellation fees on the backside." We conclude that a reasonable jury could find from this evidence that the parties had formed a contract on April 5 for Gabriel Brothers to pay Barkley's actual costs.

Gabriel Brothers also contends that Barkley failed to present evidence that Barkley's services were of value to Gabriel Brothers, that Barkley charged only for work that was requested, that the charges reflected properly done work that met Gabriel Brothers's deadlines, and that the charges were accurate and reasonable.

-18-

Under its actual-costs contract, Barkley was required to prove only that Gabriel Brothers had not fully paid for the time Barkley spent on projects for Gabriel Brothers, its sufficient evidence of which was presented through its 225 pages of itemized invoices and testimony from Fromm and Mitchell about Barkley's time-keeping practices, and from which a jury could reasonably find that Barkley was entitled to $138,223.52.

## D. Attorney's Fees

Finally, Gabriel Brothers argues that it was entitled to attorney's fees under the terms of the Agreement, which provided for the recovery of attorney's fees to the prevailing party in a lawsuit brought "to construe or enforce [the Agreement]." We review *de novo* a district court's "prevailing-party determination in a contractual context." DocMagic, Inc. v. Mortg. P'ship of Am., L.L.C., 729 F.3d 808, 812 (8th Cir. 2013). "A prevailing party is the party prevailing on the main issue in dispute." Flamingo Pools, Spas, Sunrooms & More Store, Inc. v. Penrod, 993 S.W.2d 588, 590 (Mo. Ct. App. 1999). Although Gabriel Brothers contends that it prevailed because it was awarded summary judgment on Barkley's breach-of-the-Agreement claim, both parties raised and lost their respective claims to enforce the Agreement, and we thus agree with the district court that neither was the prevailing party.

The judgment is affirmed in part and reversed in part, and the case is remanded for the entry of an award of prejudgment interest.

_____