# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1410

_____

Jimmy Lee Letterman; Annette Fay Letterman

*Plaintiffs - Appellees*

v.

Jon Does, individually, and in their official capacities

*Defendant*

Steven Lammers; Noreen Gastineau; Jerry Farnsworth; Bryan Earls

*Defendants - Appellants*

Marcia Jennings

*Defendant*

_____

No. 16-1771

_____

Jimmy Lee Letterman; Annette Fay Letterman

*Plaintiffs - Appellees*

v.

Jon Does, individually, and in their official capacities

*Defendant*

Steven Lammers; Noreen Gastineau; Jerry Farnsworth; Bryan Earls

*Defendants - Appellants*

Marcia Jennings

*Defendant*

_____

Appeals from United States District Court
for the Western District of Missouri - St. Joseph

_____

Submitted: April 5, 2017
Filed: June 22, 2017

_____

Before GRUENDER, MURPHY, and KELLY, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Jimmy Lee and Annette Fay Letterman brought suit under 42 U.S.C. § 1983 and Missouri tort law against officers of the Missouri Department of Corrections ("Defendants") for the death of their son while in custody. Three of the Defendants previously appealed the district court's[1] order denying them qualified immunity, and we affirmed as to two of them. *Letterman v. Does*, 789 F.3d 856, 863-64 (8th Cir. 2015). Defendants now appeal a jury verdict in favor of the Lettermans. For the following reasons, we affirm.

_____

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

# I. Background

In late 2011, Danial Letterman ("Danial") began to serve a sentence for a drug-related probation violation at the Western Reception, Diagnostic, and Correctional Center ("WRDCC") of the Missouri Department of Corrections. During his sentence, mental health staff placed Danial on suicide watch and moved him to a secured, padded room in the Transitional Care Unit ("TCU"). The facility's close observation policy required officers to check on Danial every fifteen minutes and record their observations in a close observation log. If they could not observe movement, obtain a verbal response, or see him breathing, the officers were required to report it as a medical emergency.

Just before midnight on November 17, 2011, Danial fell twice in his padded cell. After the first fall, Danial got back up. In the second fall, Danial hit his head on the doorjamb, causing a noise loud enough to prompt Officer Steven Lammers, the officer on duty, to come to the cell to check on him. Lammers saw Danial on the ground and asked if he needed medical assistance. Danial did not respond verbally but waved his hand. Lammers did not obtain medical assistance and noted in the close observation log that Danial was "good." Danial remained conscious between ten and twenty minutes after the fall but did not move from his position on the floor beside the door.

When Officer Noreen Gastineau relieved Lammers at 7:30 a.m., Danial was still lying on the floor by the door, and Lammers informed Gastineau that Danial had not moved all night after falling. During the morning, one of the TCU doctors came to speak with Danial and knocked on the door of his cell. In response, Danial grunted and moved his foot and head. Around 9 a.m., medical personnel indicated that Danial needed to be awoken, and Gastineau kicked the door, yelled at Danial, and splashed water on his face. In response, Danial moved his head slightly and fluttered his eyelids. Gastineau contacted Sergeant Jerry Farnsworth and informed him that Danial

-3-

had not moved from his position since the beginning of her shift and that the cell door needed to be opened so medical personnel could check Danial's vital signs. Farnsworth indicated that he could not spare an officer to access the cell. Shortly thereafter, Lieutenant Bryan Earls, the supervising officer, passed through the TCU on his rounds, and a nurse requested that Earls open the door so she could check Danial's vitals. Gastineau informed Earls that Danial had not moved all day. Earls refused to open the cell, instead suggesting that they "let sleeping dogs lie." Around 2:00 p.m., Marcia Jennings, the TCU's Functional Unit Manager, observed Danial lying in a strange position, and Gastineau informed her that Danial had not moved since last night and had not eaten. Jennings did not report it as a medical emergency; rather, she went to her office and began making phone calls in an attempt to get Danial's cell door open. Around 4:00 p.m., a team finally opened the cell door, and the nurse determined that Danial required immediate medical attention. Danial was transported to the hospital, where he died of subdural bleeding caused by a head injury.

Danial's parents sued the Defendants for denial of medical care, personal injuries, and wrongful death under both 42 U.S.C. § 1983 and Missouri tort law. Three of the Defendants moved for summary judgment on the basis of qualified immunity, and the district court denied the motion. This court affirmed except as to Jennings. *Letterman*, 789 F.3d at 865. The case proceeded to trial and the jury rendered a verdict in favor of the Lettermans. For the denial of medical care claim, the jury awarded $6,793.29 for funeral and burial expenses, $100,000 for pain and suffering, and $150,000 for the constitutional violation. The jury also awarded punitive damages against each defendant related to the denial of medical care claim. For the wrongful death claim, the jury awarded $1,000,000. Defendants renewed their request for judgment as a matter of law and alternatively moved for a new trial, challenging the jury instructions and several evidentiary rulings. The district court denied the motions and awarded attorney's fees and costs to the Lettermans pursuant to 42 U.S.C. § 1988. Defendants now appeal.

## II. Discussion

Defendants raise a number of issues on appeal. First, they contend they are entitled to judgment as a matter of law as to the pain and suffering claim. Second, Defendants argue that they are entitled to a new trial because the jury was not instructed on official immunity under Missouri law. Defendants also argue a new trial is warranted because the district court erred in several evidentiary rulings.

### A. Judgment as a Matter of Law

We "review the district court's denial of a motion for judgment as a matter of law de novo, using the same standards as the district court." *Luckert v. Dodge Cty.*, 684 F.3d 808, 816 (8th Cir. 2012) (quotation omitted). Thus, "[w]e review the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor and resolving all factual disputes in its favor." *Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418, 422 (8th Cir. 2007). The court is not at liberty to reweigh the evidence "or consider questions of credibility," and it must "give great deference to the jury's verdict." *Howard v. Mo. Bone & Joint Ctr., Inc.*, 615 F.3d 991, 995 (8th Cir. 2010) (citations omitted). "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." *Id.* (quotation omitted).

Defendants contend that the evidence is not sufficient to support the award of damages for pain and suffering because Danial could only have experienced pain and suffering during the twenty minutes he retained consciousness after his second fall and that "there was no evidence any Defendant knowingly failed to provide Letterman needed care" during that period. However, even assuming Defendants are correct that no evidence demonstrates they knowingly failed to provide needed care within twenty minutes after the second fall, Defendants ignore evidence that Danial

did not remain completely unconscious throughout the following hours. Gastineau testified that about mid-morning she attempted to elicit a response from Danial by kicking on the door, yelling at him, and sprinkling water on his face. Although he did not respond verbally, he did move his head and flutter his eyelids. Earlier in the morning, one of the TCU doctors attempted to elicit a response from Danial by knocking on the door, and he grunted and moved his foot and head slightly. Defendants argue that these movements are consistent with light unconsciousness. However, Danial's movements are also consistent with consciousness, and the jury is entitled to make that determination. Defendants also suggest that Dr. Mary Case, the Lettermans' expert witness, concluded that Danial never regained consciousness. However, they mischaracterize her testimony. Dr. Case testified that, in her opinion, Danial was not conscious longer than twenty minutes after his second fall. She was not asked whether he regained consciousness at a later time. Thus, the evidence is sufficient to support a reasonable inference sustaining the award of damages for pain and suffering. As a result, we affirm the district court's denial of judgment as a matter of law.

## B. Motion for New Trial

Defendants next appeal the district court's denial of their motion for a new trial. "Under [Federal Rule of Civil Procedure] 59, the decision to grant a new trial lies within the sound discretion of the trial court, and its discretion will not be reversed on appeal absent a clear abuse of that discretion." *Id.* at 995. Defendants argue that the district court erred by failing to instruct the jury on official immunity under Missouri law. Defendants also challenge the district court's refusal to admit evidence regarding (1) the medical staff's lack of concern for Danial's nonresponsiveness, (2) Danial's bad character, and (3) Danial's posthumous social security disability benefits award.

## 1. Official Immunity

Although Defendants raised official immunity along with qualified immunity in their motions for summary judgment, the district court determined that it required more evidence and declined to decide official immunity until trial. Thus, official immunity was not at issue in the previous, interlocutory appeal. *See Letterman*, 789 F.3d at 856. At trial, the district court decided as a matter of law that Defendants were not entitled to official immunity. Accordingly, it instructed the jury to find the Defendants liable if they were negligent. Defendants contend that they are entitled to official immunity and, as a result, the jury should have been instructed to hold them liable only if they acted with malice. Although Defendants characterize their argument as challenging the jury instructions, it is more properly construed as challenging the district court's determination that they were not entitled to official immunity.[2] Thus, whether Defendants are entitled to official immunity is a question of law we review *de novo*. *Murray*, 915 F.2d at 1199; *see also Boude v. City of Raymore*, 855 F.3d 930, 935 (8th Cir. 2017) (reviewing the district court's grant of summary judgment based on official immunity *de novo*).

Missouri applies the doctrine of official immunity to "protect[] public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008) (en banc). "The official immunity

---

[2]We note that a finding of official immunity usually prevents a case from going to trial rather than informing jury instructions. *See Murray v. Leyshock*, 915 F.2d 1196, 1199 (8th Cir. 1990) (affirming grant of judgment notwithstanding the verdict on the basis of official immunity and noting that "[u]nder the well-established Missouri official immunity doctrine, it is highly improbable that the Missouri Supreme Court would have allowed Murray's state law negligence claim to go to a jury as a matter of law" (citations omitted)); *see also Hawkins v. City of Farmington*, 189 F.3d 695, 703 (8th Cir. 1999) (affirming judgment as a matter of law as to a negligence claim on the basis of official immunity).

doctrine, however, does not provide public employees immunity for torts committed when acting in a ministerial capacity." *Id.* (citation omitted). "A discretionary act requires the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued," *id.* (citation omitted), while a ministerial function "is one of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed," *id.* (quotation omitted). Which category an act falls into is determined "on a case-by-case basis" considering three factors: "(1) the nature of the public employee's duties; (2) the extent to which the act involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity." *Id.* (citation omitted). However, official immunity does not apply where the discretionary act "is willfully wrong or done with malice or corruption." *Id.* (citation omitted).

Defendants primarily challenge the first prong of the official immunity test, arguing that the nature of the officers' duties under the close-observation policy demonstrates that the policy is discretionary. Defendants contend that the officers must use discretion in determining whether an inmate has shown movement or response because inmates are allowed to sleep while on close observation. Thus, they argue, officers must differentiate between lack of response due to sleep and lack of response due to medical emergency to determine if and when to report nonresponsiveness under the policy. However, this assertion is inaccurate. The close-observation policy requires officers to check on the inmate every fifteen minutes and report as a medical emergency any instance when they cannot observe movement or obtain a verbal response or when it appears that the inmate is not breathing. Whether the inmate is asleep is irrelevant, because the movement requirement may be satisfied by the rise and fall of the inmate's chest as he breathes. The duty to report a medical emergency when one of these criteria is met is

mandatory and does not depend on the officer's assessment of whether a medical emergency actually exists.

Moreover, even if we accept Defendants' contention that executing the close-observation policy requires discretion in determining what constitutes movement or response, it does not follow that the close-observation policy is discretionary for purposes of official immunity. For example, driving inherently involves some discretion, but police officers receive official immunity only when responding to an emergency situation. *Southers*, 263 S.W.3d at 618. They do not receive official immunity when driving to nonemergency situations, even when the driving is performed on duty. *Id.* In the same way, even if discretion is involved in determining whether the inmate has manifested the necessary response, it does not follow that the act of reporting a medical emergency when a response is not received is discretionary.

The second and third factors also weigh in favor of finding the policy mandatory rather than discretionary. The officers only are called upon to observe the inmate and obtain a response at a prescribed interval. The task confers no policymaking authority and requires no professional judgment. Finally, imposing liability in these circumstances would not have the effect of making officers inappropriately cautious—the consequence official immunity is designed to prevent. *See, e.g.*, *Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760, 763 (Mo. 2006) (en banc) ("Imposing liability upon the officer in these cases might delay responses to emergency calls, thereby adversely affecting officers or citizens in need of emergency assistance."). Thus, the close-observation policy fits neatly into the category of actions "which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Southers*, 263 S.W.3d at 610 (citation omitted). As a result, the close-observation policy is ministerial and Defendants were not entitled to official immunity.

## 2. Evidence of Medical Staff Response

Defendants next contend that they are entitled to a new trial because the district court refused to admit evidence that medical staff at WRDCC were unconcerned with Danial's nonresponsiveness because they believed he was sleeping. This evidence, they argue, would demonstrate that Defendants did not have actual knowledge of Danial's medical needs. *See Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (explaining that to prove a claim of deliberate indifference to an inmate's serious medical needs, the plaintiff must show that the officers "actually knew of, but deliberately disregarded, [the inmate's] medical needs")). "Rulings on admissibility of evidence will not be reversed absent a clear and prejudicial abuse of discretion." *Pittman v. Frazer*, 129 F.3d 983, 989 (8th Cir. 1997).

The district court did not abuse its discretion. In the first appeal, we explained that, "[w]hen evaluating whether an actor deliberately disregarded a risk, we consider his actions in light of the information he possessed at the time . . . ." *Letterman*, 789 F.3d at 862 (quotation omitted). "We focus on the mind of the prison official and the information at his disposal, not the thoughts of third-party actors who do not disclose their thoughts." *Id.* at 863 (citation omitted). The district court permitted Defendants to introduce evidence as to what medical staff told Defendants, but it did not admit evidence of what the medical staff thought but did not communicate to them. As a result, the district court did not clearly and prejudicially abuse its discretion by determining that evidence of what medical staff thought but did not disclose is irrelevant and, therefore, inadmissable. *See* Fed. R. Evid. 401, 402.

## 3. Damages Evidence

Defendants further assert that they are entitled to a new trial because the district court refused to admit evidence that Danial used drugs, had unsavory tattoos, gave up a child for adoption, and posthumously received disability benefits. Defendants

contend that this evidence is "broadly relevant" to the amount of damages for loss of consortium and wrongful death. However, Defendants make no attempt to counter the district court's reasons for excluding the evidence—that it is cumulative, unfairly prejudicial, and has the potential to mislead the jury. Federal Rule of Evidence 403 allows the district court to exclude relevant evidence for these reasons. Thus, even if we agree with Defendants that the evidence is relevant, Defendants must provide a reason why the district court abused its discretion by excluding the evidence under Rule 403. They do not provide any such reason, and, accordingly, we have no basis to disturb the district court's evidentiary rulings. *See* Fed. R. App. P. 28(a)(8)(A) (stating that an appellant's brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *United States v. Mshihiri*, 816 F.3d 997, 1009 n.5 (8th Cir. 2016) (citing Fed. R. App. P. 28(a)(8)(A) and finding that a party waived an argument by failing to meaningfully argue it).

## III. Conclusion

For the foregoing reasons, we affirm.

_____

-11-