# United States Court of Appeals

## For the Eighth Circuit

_____

No. 20-1595

_____

Jacobson Warehouse Co., Inc., doing business as XPO Logistics Supply Chain

*Plaintiff - Appellee*

v.

Schnuck Markets, Inc.

*Defendant - Appellant*

_____

No. 20-1690

_____

Jacobson Warehouse Co., Inc., doing business as XPO Logistics Supply Chain

*Plaintiff - Appellant*

v.

Schnuck Markets, Inc.

*Defendant - Appellee*

_____

Appeals from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 14, 2021
Filed: September 7, 2021
_____

Before KELLY, GRASZ, and KOBES, Circuit Judges.
_____

KELLY, Circuit Judge.

This breach of contract and tort dispute arises from a business relationship between a regional supermarket chain and a logistics company that managed one of its distribution centers. Defendant, Schnuck Markets, Inc. (SMI), and Plaintiff, Jacobson Warehouse Company, Inc. d/b/a XPO Logistics Supply Chain (XPO), cross-appeal parts of the district court's[1] orders and judgment. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

SMI is a supermarket retailer that owns and operates "Schnucks" branded grocery stores across Missouri, Illinois, Indiana, Iowa, and Wisconsin. XPO is a global logistics company that, among other things, provides warehouse management and related logistical services to clients. Effective May 1, 2015, XPO and SMI entered into an Amended and Restated Operating Agreement (the Agreement) that set forth the terms and conditions under which XPO would provide certain warehouse management services for a new distribution center (Northpark) that SMI was planning to utilize. Previously, SMI had used three distribution centers in and around St. Louis, Missouri, to provide perishable and non-perishable groceries to Schnucks stores in the surrounding area. With XPO managing Northpark, SMI planned to

_____

[1]The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri.

-2-

transition the majority of its warehousing and distribution services to Northpark when the facility was ready.

XPO began providing warehouse management services at Northpark in July 2016, during which time SMI transferred large amounts of inventory from its other warehouses to Northpark. Almost immediately, Northpark began to experience operational issues, including with its receipt of fresh produce from another warehouse and its shipping of food to Schnucks stores. According to SMI, XPO's mismanagement of this transition period resulted in the loss of or damage to substantial amounts of inventory, often when pallets of food were improperly stored within Northpark or left to spoil on the distribution center's docks, as well as diminished sales at local Schnucks stores (whose inventories were consequently reduced). And SMI incurred additional expenses to mitigate the severity of the situation (e.g., temporarily moving inventory back to SMI's other warehouses, implementing promotional deals to retain grocery store shoppers). Although this "crisis" was largely resolved within a few weeks, SMI claims that XPO continued to mismanage Northpark, resulting in additional lost or damaged inventory and XPO running substantially over budget. Several months into XPO's management of Northpark, SMI demanded that XPO reimburse SMI for the losses XPO allegedly caused and began withholding payments from XPO.

On February 17, 2017, XPO sued SMI, claiming among other things that SMI had breached the Agreement and unlawfully withheld payments for properly performed warehouse management services. SMI counterclaimed, alleging among other things that XPO had breached the Agreement and negligently managed Northpark. In a contentious litigation, the parties proceeded through discovery and pre-trial motions practice to trial. At the conclusion of a ten-day trial, the jury rendered its verdict, awarding $3,650,526.38 (as modified by post-trial orders granting pre-trial interest and offset) to XPO on its action on account claim, and

awarding $147,000 to SMI on its breach of contract claim. The district court considered and decided the parties' post-trial motions, and the parties now cross-appeal.

## II. SMI's Arguments on Appeal

*A. Dismissal of SMI's Counterclaims for Non-Direct Damages Under Section 5(b) of the Agreement.*

First, SMI argues that the district court erred by misinterpreting Section 5(b) of the Agreement to dismiss SMI's breach of contract, breach of the covenant of good faith and fair dealing, negligence, fraud, and conversion claims to the extent they sought damages other than direct damages (e.g., incidental, consequential, indirect, special, or punitive damages).[2] We review de novo the district court's grant of a motion to dismiss and grant of a motion for judgment on the pleadings, "accepting the facts alleged in the complaint as true and drawing all reasonable inferences in favor of the nonmovant." Pietoso, Inc. v. Republic Servs., Inc., 4 F.4th 620, 622 (8th Cir. 2021); see Gallagher v. City of Clayton, 699 F.3d 1013, 1016 (8th Cir. 2012). To survive either motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Gallagher, 699 F.3d at 1016 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

---

[2]In addition to seeking direct damages for inventory loss, SMI sought damages for its alleged "lost profits, lost sales, lost productivity, lost inventory, increased labor expenses, increased or additional clean-up expenses, equipment rental expenses, loss of backhaul revenue, increased acquisition costs, increased transportation expenses, increases in workers' compensation claims and expenses, increases in severance owed, excessive Warehousing Fees, and damages to SMI's . . . reputation and goodwill." (Dist. Ct. Dkt. 69 at ¶ 62.)

Under Missouri law,[3] "[t]he construction and interpretation of a contract is a matter of law," and we pay no deference to the trial court's interpretation. Sligo, Inc. v. Nevois, 84 F.3d 1014, 1019 (8th Cir. 1996). "The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." J.H. Berra Constr. Co. v. City of Washington, 510 S.W.3d 871, 874 (Mo. Ct. App. 2017) (quoting Dunn Indus. Grp., Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo. banc 2003)). A contract is unambiguous when it "uses plain and unequivocal language," in which case we enforce it as written. Deal v. Consumer Programs, Inc., 470 F.3d 1225, 1230 (8th Cir. 2006). A contract is ambiguous, on the other hand, when "its terms can be genuinely and reasonably construed in more than one way." J.H. Berra Constr., 510 S.W.3d at 874. "To determine whether a contract is ambiguous, we consider the instrument as a whole, giving the words contained therein their ordinary meaning." Deal, 470 F.3d at 1230. "A contract is not ambiguous merely because the parties dispute its meaning." Id.

The parties' dispute centers on their varying interpretations of Section 5(b) of the Agreement, which provides in pertinent part:

[1] Subject to its applicable insurance limit(s), each party shall indemnify and hold the other and its representatives harmless from and against all claims, liabilities, losses, damages and expenses (including reasonable attorneys' fees and expenses) incurred or suffered by any of them as a result of or in connection with (i) any breach of any of their respective obligations under this Agreement or (ii) the negligence or willful misconduct of the indemnifying party or its representatives. [2] In addition, XPO shall defend, indemnify and hold [SMI] harmless from

[3]In this diversity action, the parties agree that Missouri law governs the interpretation of the Agreement given the Agreement's choice of law provision. See Agreement § 13(f) ("This Agreement shall be governed and construed in accordance with the laws of the State of Missouri.").

and against all claims, liabilities, losses, damages and expenses made and/or assessed by the landlord of the Facility (including reasonable attorneys' fees and expenses) and incurred or suffered by [SMI] and its representatives as a result of or in connection with XPO's breach of this Agreement, willful misconduct, negligent acts or negligent omissions. . . . [4] Except for their respective indemnification obligations hereunder, as limited herein, unless otherwise prohibited by law, neither party shall be liable for incidental or consequential damages or indirect, special or punitive damages.

Agreement § 5(b). Both parties argue that Section 5(b) is unambiguous, but they disagree as to its meaning. SMI focuses on the first sentence of Section 5(b) (the Indemnification Provision). That provision, according to SMI, creates first-party indemnification obligations that are not subject to the damages limitations set forth in the fourth sentence of Section 5(b) (the Limitation of Liability Provision). In contrast, XPO argues that the Indemnification Provision creates only third-party indemnification obligations. Thus, under XPO's view, the Limitation of Liability Provision limits either party's exposure to first-party claims solely to direct damages.

Having carefully examined the language of Section 5(b) and the Agreement as a whole, we conclude that Section 5(b) unambiguously bars SMI from recovering non-direct damages from XPO. Setting aside the prefatory clause for a moment, the Limitation of Liability Provision clearly provides, "unless otherwise prohibited by law, neither party shall be liable for incidental or consequential damages or indirect, special or punitive damages." This language does not purport to cabin the types of claims to which the limitation applies (e.g., first- vs. third-party claims, contract vs. tort claims).[4]

---

[4]Other provisions in the Agreement suggest that the parties intended XPO to be liable to SMI solely for direct damages, at the least for lost or damaged inventory.

SMI nevertheless focuses on the Limitation of Liability Provision's prefatory clause—"[e]xcept for their respective indemnification obligations hereunder, as limited herein"—to argue that it is not limited to recovering direct damages in this case. SMI asserts that, pursuant to the Indemnification Provision, XPO has a first-party indemnification obligation to SMI, and that obligation is expressly excepted from the damages limitation. We disagree. Viewed in light of Missouri contract law and the whole Agreement, we read the Indemnification Provision to create only mutual third-party indemnification obligations for XPO and SMI.

To begin, we are conscious that "[i]ndemnity suits ordinarily arise in the context of third-party claims." Monarch Fire Prot. Dist. of St. Louis Cnty. v. Freedom Consulting & Auditing Servs., Inc., 644 F.3d 633, 638 (8th Cir. 2011). Although Missouri law does not limit indemnification to third-party claims, see Praetorian Ins. Co. v. Site Inspection, LLC, 604 F.3d 509, 516 (8th Cir. 2010), we look for "express language referencing litigation between the parties" before concluding that an indemnification provision encompasses first- *and* third-party claims, Monarch Fire, 644 F.3d at 638. The Indemnification Provision contains no such express language, and we presume the parties intended to create indemnification obligations in their ordinary sense. See Indemnity, Black's Law Dictionary (11th ed. 2019) ("Reimbursement or compensation for loss, damage, or liability in tort; esp.,

---

See, e.g., Agreement § 5(a)(i) ("Where XPO is otherwise liable under this Agreement for loss of, or damage to inventory, said liability shall be limited to the actual cost of the inventory lost or damaged based on the replacement cost for said inventory."); Agreement § 6(c) ("XPO shall be responsible, at its sole cost and expense, for all inventory losses due to pilferage or damage caused by the negligence or willful misconduct of XPO or its employees . . . ."); Agreement § 6(h) (noting, in accordance with the Inventory Claim Procedure for "damaged, spoiled, out-of-date, [or] missing" inventory, that "[SMI] shall be entitled to reimbursement for [lost or damaged inventory] at the replacement cost of the inventory lost or damaged").

the right of a party who is secondarily liable to recover from the party who is primarily liable for reimbursement of expenditures paid to a third party for injuries resulting from a violation of a common-law duty."). This reading is supported by the second sentence of Section 5(b), which requires XPO to not only indemnify but also defend SMI from claims brought by a specific *third party*: Northpark's landlord. Read together, the first and second sentences of Section 5(b) indicate that XPO and SMI were contemplating third-party indemnification in the Indemnification Provision.

Finally, by reading the Indemnification Provision as only creating third-party indemnification obligations, we avoid rendering any portion of Section 5(b) surplusage. Under Missouri contract law, "people are presumed not to intend nullities," and a contract's "preferred construction is one that provides a reasonable meaning to *each* phrase and clause, not one that leaves some of the provisions without function or sense." Tuttle v. Muenks, 21 S.W.3d 6, 12 (Mo. Ct. App. 2000) (cleaned up); see also United States v. Lewis, 673 F.3d 758, 762 (8th Cir. 2011) ("[I]t is a familiar principle of contractual interpretation that contracts must be interpreted to give effect to every provision." (cleaned up)). Recall that the Limitation of Liability Provision provides: "Except for their respective indemnification obligations hereunder, . . . neither party shall be liable for incidental or consequential damages or indirect, special or punitive damages." If, as SMI argues, the Indemnification Provision created both first- and third-party indemnification obligations, those obligations all would be excepted from the Limitation of Liability Provision, meaning *no* liabilities would be limited. Such a reading would render the Limitation of Liability Provision meaningless. Indeed, SMI has failed to identify a single claim that could conceivably fall outside of the Indemnification Provision under this reading yet still be subject to the Limitation of Liability Provision.

We conclude that the Agreement bars SMI from recovering non-direct damages from XPO.

*B. Whether Section 5(b) of the Agreement Violates Missouri Public Policy by Limiting Damages for XPO's Alleged Gross Negligence or Willful Misconduct.*

Next, SMI argues that the Limitation of Liability Provision violates Missouri public policy, and is thus unenforceable, because it contravenes the following contract law principle: "[O]ne may never exonerate oneself from future liability for intentional torts or for gross negligence." Alack v. Vic Tanny Int'l of Mo., Inc., 923 S.W.2d 330, 337 (Mo. banc 1996). When interpreting Missouri law, "we are bound by the decisions of the Supreme Court of Missouri." Washington v. Countrywide Home Loans, Inc., 747 F.3d 955, 957–58 (8th Cir. 2014). Where the Supreme Court of Missouri has not directly addressed the issue presented, as here, "we must predict how the court would rule, . . . follow[ing] decisions from the intermediate state courts when they are the best evidence of Missouri law." Id. at 958.

At the outset, we question whether the cited principle—articulated in a case involving adhesion contracts between a business and consumers—applies with equal force to a contract negotiated at arm's length between sophisticated commercial entities. See Alack, 923 S.W.2d at 338 n.4; see also Purcell Tire & Rubber Co. v. Exec. Beechcraft, Inc., 59 S.W.3d 505, 508 (Mo. banc 2001) ("Sophisticated parties have freedom of contract . . . [and] may contractually limit future remedies."); cf. Util. Serv. & Maint., Inc. v. Noranda Aluminum, Inc., 163 S.W.3d 910, 914 (Mo. banc 2005) (noting the "economic reality" that sophisticated businesses "price" contractual terms, including indemnities that cover "any and all claims," into their agreements). We also note that, since Alack was decided, the Supreme Court of Missouri has narrowed this principle: "[B]ecause Missouri courts do not recognize degrees of negligence at common law," exculpatory clauses that exonerate parties for their gross

negligence are not void as against public policy. DeCormier v. Harley-Davidson Motor Co. Grp., 446 S.W.3d 668, 671 (Mo. banc 2014). This leaves SMI to argue only that the Limitation of Liability Provision violates public policy because it insulates XPO for its willful misconduct, which is noteworthy, as we have doubts that SMI has offered facts necessary to show that XPO engaged in willful misconduct. Cf. id. at 672–73 (declining to hold limitation of liability unenforceable for insulating the defendant for its reckless conduct because the plaintiff failed to establish facts necessary to show recklessness); Ferbet v. Hidden Valley Golf & Ski, Inc., 618 S.W.3d 596, 603 n.1 (Mo. Ct. App. 2020).

In any event, the Limitation of Liability Provision does not *exonerate* XPO from future liability. The provision provides: "[N]either party shall be liable for incidental or consequential damages or indirect, special or punitive damages." This plain language does not insulate XPO for its gross negligence or willful misconduct; it merely limits the types of damages that may be recovered for XPO's wrongdoing. In Liberty Financial Management Corp. v. Beneficial Data Processing Corp., the Missouri Court of Appeals construed a similar limitation of liability provision. 670 S.W.2d 40, 47–48 (Mo. Ct. App. 1984). In that case, the parties had agreed that the defendant would be "liable for breach of contract only for willful or grossly negligent acts and then only for 'out-of-pocket losses' [i.e., direct damages] resulting from the breach." Id. at 47. Because the agreement did not wholly exempt the defendant from liability arising from its own willful misconduct or gross negligence, the court determined it did not violate public policy. Id.; see also In re NHB, LLC, 287 B.R. 475, 478–79 (E.D. Mo. Bankr. 2002) ("[S]hort of complete exoneration, sophisticated parties may contractually limit their liability to each other for willful acts and gross negligence. Exoneration versus a limitation of liability is a distinction with a difference."). Similarly, the Limitation of Liability Provision here contractually

limits both parties' liability to each other, but does not exonerate them. It is, therefore, not contrary to Missouri public policy.

*C. Whether Section 5(b) of the Agreement Violates Missouri Public Policy by Preventing SMI from Recovering Losses Incurred Mitigating Its Damages.*

SMI also argues that the Limitation of Liability Provision is unenforceable to the extent it prevents SMI from recovering the losses it incurred when it mitigated the damages caused by XPO's alleged misconduct. But SMI has not directed us to any authorities demonstrating that Missouri law assures, as a matter of public policy, that an injured party may recover such losses. Instead, under Missouri law, a plaintiff's "failure to mitigate damages is an affirmative defense," Riddell v. Bell, 262 S.W.3d 301, 305 (Mo. Ct. App. 2008), that can be raised by a defendant to limit the measure of damages recoverable by the plaintiff, see Hertz Corp. v. RAKS Hosp., Inc., 196 S.W.3d 536, 548 (Mo. Ct. App. 2006); see also Scheck Indus. Corp. v. Tarlton Corp., 435 S.W.3d 705, 729 (Mo. Ct. App. 2014) ("Under the rule of mitigation of damages, one damaged through [the] alleged breach by another of some legal duty or obligation has to make reasonable efforts to minimize the resulting damage." (cleaned up)); Restatement (Second) of Contracts § 350(1) (Am. L. Inst. 1981) ("[D]amages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation."). The Limitation of Liability Provision does not violate Missouri public policy simply because it prevents SMI from recovering its mitigation damages.

*D. Classification of SMI's Claimed Damages as Consequential Damages.*

In addition to its challenge to the enforceability of the Limitation of Liability Provision, see supra Sections II.B–.C, SMI contends that the district court erred by determining at summary judgment that three categories of SMI's claimed damages

were consequential damages and therefore barred under the Agreement. See Agreement § 5(b) ("[N]either party shall be liable for incidental or consequential damages or indirect, special or punitive damages."). "We review de novo the district court's grant of summary judgment, viewing all evidence and drawing all reasonable inferences in favor of the nonmoving party." Odom v. Kaizer, 864 F.3d 920, 921 (8th Cir. 2017) (cleaned up). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Anderson v. Hess Corp., 649 F.3d 891, 896 (8th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

Under Missouri law, actual damages are damages stemming from "the direct and natural consequences of the [defendant's] breach" of some duty. Kforce, Inc. v. Surrex Solutions Corp., 436 F.3d 981, 984–85 (8th Cir. 2006); see also Restatement (Second) of Contracts § 347(a) & cmt. b (describing an injured party's entitlement to the loss in value "of the [injuring] party's performance that is caused by the failure of, or deficiency in, that performance"). Consequential damages, in contrast, are "loss[es] resulting from [the injured party's] general or particular requirements and needs of which [the injuring party] had reason to know and which could not reasonably be prevented." Gen. Elec. Cap. Corp. v. Rauch, 970 S.W.2d 348, 358 (Mo. Ct. App. 1998); see also Ullrich v. CADCO, Inc., 244 S.W.3d 772, 779 (Mo. Ct. App. 2008) (defining consequential damages as "those damages naturally and proximately caused by the commission of the breach and those damages that reasonably could have been contemplated by the [injuring party] at the time of the parties' agreement"); Restatement (Second) of Contracts § 347(b) & cmt. c ("Consequential losses include such items as injury to person or property resulting from defective performance."). Generally, all losses are recoverable. See Restatement (Second) of Contracts § 347 cmt. c. However, where parties agree to

exclude liabilities for certain damages, as here, the damages available to the injured party will be circumscribed accordingly.  See id. § 347 cmt. a.

First, SMI argues that the district court improperly classified lost profits as consequential, rather than actual, damages.  SMI seeks lost profits related to a decrease in sales at its grocery stores that it claims was directly caused by XPO's mismanagement of Northpark and the resulting lost, damaged, or spoiled inventory. Lost profits refers to "the amount of net profits a plaintiff would have realized if its clients had not been lost as a result of a defendant's actions."  See Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc., 155 S.W.3d 50, 54 (Mo. banc 2005) (cleaned up).  Although "it is incorrect to classify mechanically the prospective lost profits portion of [an injured party's] damage award as consequential damages," Computrol, Inc. v. Newtrend, L.P., 203 F.3d 1064, 1071 n.5 (8th Cir. 2000), here the Agreement bars the recovery of the lost profits SMI seeks.  As an initial matter, it is undisputed that the Agreement expressly provides that XPO will be liable for only the actual replacement cost of lost or damaged inventory.  See supra note 4.  Moreover, the lost profits sought here are consequential damages.  SMI's decreased sales were an ancillary effect of XPO's deficient warehouse management.  XPO may have anticipated such damages in the event of a breach, but a loss of sales to third-party customers was not assured, and SMI's lost profits cannot reasonably be described as "the direct and natural consequence" of a breach of the Agreement.

Second, SMI seeks to recover the expenses incurred to transfer some of its inventory from Northpark to another warehouse and to stock its supermarkets from both warehouses when faced with XPO's failure to properly manage Northpark. Incidental damages include "any reasonable expense incident to the breach."  Gen. Elec. Cap. Corp., 970 S.W.2d at 358; see also Restatement (Second) of Contracts § 347 cmt. c ("Incidental losses include costs incurred in a reasonable effort, whether

successful or not, to avoid loss . . . ."). Moving inventory out of Northpark was an effort by SMI to mitigate the effects of XPO's deficient warehouse management. These are incidental damages barred by the Agreement's Limitation of Liability Provision.

Third, SMI claims that its expenditures incurred to correct for XPO's mismanagement of Northpark—housing and feeding its "crisis team" and paying them overtime, purchasing extra produce to stock supermarket shelves, instituting sale promotions to lure back customers, and marking down overstocked or short-dated products—were direct damages that are not barred by the Agreement. But these losses, too, were incurred to mitigate SMI's direct losses from XPO's deficient warehouse management and are not recoverable under the Limitation of Liability Provision.

*E. Grant of Judgment as a Matter of Law on SMI's Negligence Counterclaim.*

At trial, after conclusion of the evidence, XPO moved for judgment as a matter of law on SMI's negligence counterclaim, arguing that SMI provided "no evidence of a breach of any duty separate and independent from the contract." The district court agreed, reasoning that SMI's negligence counterclaim was duplicative of its breach of contract counterclaim. After the jury rendered its verdict, SMI moved for a new trial, arguing that the district court erred by granting judgment as a matter of law in favor of XPO. The court denied the motion, "finding no independent basis for negligence liability."

"Federal Rule of Civil Procedure 50 allows the trial court, after a party has been fully heard on an issue, to resolve the issue against that party and enter judgment accordingly if a reasonable jury could not find in that party's favor." <u>Adeli v.</u>

Silverstar Auto., Inc., 960 F.3d 452, 458 (8th Cir. 2020) (quoting White v. Union Pac. R.R. Co., 867 F.3d 997, 1000 (8th Cir. 2017)). We review de novo the district court's grant of a motion for judgment as a matter of law, viewing the evidence in the light most favorable to the nonmoving party. See Captiva Lake Invs., LLC v. Fidelity Nat'l Title Ins. Co., 883 F.3d 1038, 1054 (8th Cir. 2018). As with summary judgment, we look to "whether the evidence presents sufficient disagreement to require submission to a jury, or is so one-sided that one party must prevail as a matter of law." Adeli, 960 F.3d at 458 (cleaned up). "We review the denial of a motion for a new trial for a 'clear' abuse of discretion." Hallmark Cards, Inc. v. Murley, 703 F.3d 456, 462 (8th Cir. 2013).

Under Missouri law, "a mere breach of contract does not [itself] provide a basis for tort liability." Bus. Men's Assurance Co. of Am. v. Graham, 891 S.W.2d 438, 453 (Mo. Ct. App. 1994). However, in limited circumstances, "the complained of act or omission which breaches a contract may also be a negligent act which would give rise to a liability in tort." Am. Mortg. Inv. Co. v. Hardin-Stockton Corp., 671 S.W.2d 283, 293 (Mo. Ct. App. 1984). "If the duty [allegedly breached by the defendant] arises solely from the contract, the action is contractual." Bus. Men's Assurance Co., 891 S.W.2d at 453.

"The action may be in tort, however, if the party sues for breach of a duty recognized by the law as arising from the relationship or status the parties have created by their agreement." Id. Thus, in Business Men's Assurance Co., the Missouri Court of Appeals held that the plaintiff was permitted to submit both breach of contract and negligence claims against the defendant architectural firm because it demonstrated two independent duties that the defendant allegedly breached. Id. at 454 ("In addition to the contractual duties [for the rendition of architectural services] arising from the contract . . . , [the defendant] had a[n] [extracontractual] duty to

provide professional architectural services in a manner consistent with the skill and competence of other members of its profession."). Similarly, in Hardin-Stockton Corp., the district court erred by directing a verdict in favor of the defendant real estate broker on the plaintiff's negligence claim where the defendant had allegedly breached two separate duties of care. See 671 S.W.2d at 293–94 (discussing the defendant's contractual duty and its common law duty to "exercise reasonable skill, diligence, and care in the handling of business given over or entrusted to the broker").

We agree with the district court that SMI has not provided sufficient evidence to show that XPO breached a duty of care other than its contractual duty under the Agreement. In its negligence counterclaim, SMI alleges that XPO breached its duty to "conduct [its] operations pursuant to prevailing warehouse industry practices." Yet the Agreement specifically incorporates that standard of care into XPO's contractual duty. See Agreement § 2(a)(i), (iv) ("XPO agrees that the Services to be performed by XPO's personnel hereunder shall be done in a good, professional, workmanlike manner, in an expeditious and economical manner, consistent with the most efficient operation of the warehouse in accordance with the Standards and prevailing practices in the warehousing industry, and in compliance with all applicable statutes, law, ordinances, codes, rules, and regulations."). And SMI does not explain how or to what extent XPO's alleged non-contractual duty of care differs from its contractual duty. Thus, in both its breach of contract and negligence counterclaims, SMI alleges that XPO breached the same duty of care. Also, SMI seemingly concedes that the damages for both counterclaims would be the same: inventory losses. In contrast to the permissible negligence claims in Business Men's Assurance Co. and Hardin-Stockton Corp., SMI's negligence counterclaim is not based upon a common law duty that XPO owes independent of the Agreement. See 891 S.W.2d at 454; 671 S.W.2d at 294. The district court did not err in granting judgment as a matter of law in favor of XPO on SMI's negligence counterclaim, cf. Estate of Petersen v. Bitters, 954 F.3d

1164, 1171 (8th Cir. 2020) (granting judgment as a matter of law in favor of the defendant on the plaintiff's negligence claim because it was "identical" to the plaintiff's breach of fiduciary duty claim), and therefore did not abuse its discretion in denying SMI's motion for a new trial on this basis.

*F. Admission of the Ryberg Emails.*

Before trial, SMI moved to enforce a protective order that allowed either party to claw back attorney-client privileged information it had inadvertently disclosed during discovery. Specifically, SMI sought an order requiring XPO to destroy or return two emails under the clawback provision. The district court denied SMI's motion and permitted XPO to introduce the emails at trial. The court also rejected SMI's argument that the emails were unduly prejudicial under Federal Rule of Evidence 403. After trial, the district court also denied SMI's motion for new trial based on the admission of the emails.

The scope of the attorney-client privilege is a mixed question of law and fact that we review de novo. See United States v. Ivers, 967 F.3d 709, 715 (8th Cir. 2020) ("We review the district court's factual findings underlying the privilege for an abuse of discretion and its legal conclusions de novo."). Nevertheless, we review the district court's evidentiary rulings for an abuse of discretion and will reverse "only if the evidentiary ruling was a clear and prejudicial abuse of discretion," meaning it "had a substantial influence on the jury's verdict." Vogt v. State Farm Life Ins. Co., 963 F.3d 753, 770–71 (8th Cir. 2020) (cleaned up). And as noted above, we review the denial of a motion for a new trial for "a 'clear' abuse of discretion." Id. at 770.

"The attorney-client privilege protects confidential communications between an attorney and client concerning representation of the client." State ex rel. Polytech,

Inc. v. Voorhees, 895 S.W.2d 13, 14 (Mo. banc 1995) (cleaned up).[5]  As the party asserting the attorney-client privilege, SMI bears the burden of proof to demonstrate that the privilege applies.  See State ex rel. Koster v. Cain, 383 S.W.3d 105, 116 (Mo. Ct. App. 2012).  The attorney-client privilege applies to corporations and "covers counsel's communications with both top management and lower level employees." DeLaporte v. Robey Bldg. Supply, Inc., 812 S.W.2d 526, 531 (Mo. Ct. App. 1991). Communications between corporate counsel and lower level employees will be privileged if:

> (1) *the communication was made for the purpose of securing legal advice*; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

Id. (emphasis added) (quoting Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 609 (8th Cir. 1977)).  In the corporate context, where corporate counsel may act as both business and legal advisor, to be privileged the communication "must have been made to the attorney in his professional capacity, and on account of the relation of attorney and client."  State ex rel. Great Am. Ins. Co. v. Smith, 574 S.W.2d 379, 386 (Mo. banc. 1978).  In other words, "[t]o be privileged the communication must relate to attorney-client business and not to extraneous matters."  State v. Fingers, 564 S.W.2d 579, 582 (Mo. Ct. App. 1978).

---

[5]We look to Missouri law, which governs questions involving privilege in this diversity action.  See Baker v. Gen. Motors Corp., 209 F.3d 1051, 1053 (8th Cir. 2000); Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.").

-18-

The district court did not abuse its discretion by determining that the two emails SMI sought to exclude did not seek or reflect legal advice. Both emails were sent by Jaime Ryberg, SMI's Accounts Payable Manager, to Mark Doiron, SMI's Chief Merchant and Supply Chain Officer, and Rachel Steele, SMI's Assistant General Counsel, and the second email was also sent to Brian Brink, in-house counsel at SMI. In both emails, Ryberg discussed the application of the Agreement's Loss Allowance Provision,[6] noting her particular concern that XPO might avoid compensating SMI for some lost inventory by moving inventory around within Northpark.[7]

We agree with the district court that Ryberg, in voicing her concerns, was not explicitly or implicitly seeking legal advice on the correct interpretation of the Loss Allowance Provision. Nor did the emails reflect the legal advice of counsel. Rather, Ryberg was explaining the potential financial implications of XPO's management of

---

[6]Under the Agreement, XPO was "entitled to an allowance for loss of, or damage to inventory equivalent to one percent (1%) of the cases received and the cases shipped annually by each department" at Northpark. Agreement § 6(i).

[7]In the first email, Ryberg informed her colleagues of this concern, noting "[i]f I am reading the contract correctly [XPO] can adjust the following # of cases per area before we would be able to recoup damages." Dist. Ct. Dkt. 107-1. She continued, "I want to keep the discussion on everyone's radar but if we don't feel we can recover losses from XPO then I will not make period end adjustments to results." Id. And two days later, in her second email, Ryberg elaborated on her previous email by providing a specific example of XPO potentially "gaming" the Loss Allowance Provision: "I only have a total cases shipped number right now so I don't to [sic] a full review but wanted to show you part of my concerns. If you look at product while they added inventory units they actually decreased the inventory dollar value. This is because they added lower average cost items and pitched higher average cost items. [I]f we went strictly by the contract we would not be able to recover any funds for that area." Dist. Ct. Dkt. 107-2.

Northpark based on her understanding of the Loss Allowance Provision. And although Ryberg addressed both emails to SMI's in-house counsel, she was not asking for legal advice. See Diversified Indus., 572 F.2d at 602 (explaining that, for a communication to an attorney to be privileged, "the attorney must have been engaged or consulted by the client for the purpose of obtaining legal services or advice services or advice that a lawyer may perform or give in his capacity as a lawyer, not in some other capacity"). "A communication is not privileged simply because it is made by or to a person who happens to be a lawyer." Id. Because the emails were made in the ordinary course of business and were not "prepared with the intention of seeking legal advice," they were not attorney-client privileged. See St. Louis Little Rock Hosp., Inc. v. Gaertner, 682 S.W.2d 146, 151 (Mo. Ct. App. 1984).

Nor did the district court abuse its discretion by declining to exclude the two emails for any unfair prejudice they might cause. See Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."). Unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Walker v. Kane, 885 F.3d 535, 540 (8th Cir. 2018). SMI argues that the emails were unfairly prejudicial because they improperly implied that Ryberg's interpretation of the Agreement, in the absence of any opinion from corporate counsel to the contrary, was correct. But as noted above, see supra Section II.A, "[t]he interpretation of a contract is a question of law," Helterbrand v. Five Star Mobile Home Sales, Inc., 48 S.W.3d 649, 658 (Mo. Ct. App. 2001) (cleaned up), and by suggesting how XPO might circumvent the loss allowance under the Agreement, Ryberg was not providing a legal opinion that made the Agreement susceptible to misinterpretation.

*G. Award of Prejudgment Interest to XPO.*

Finally, SMI argues that the district court erred by awarding prejudgment interest to XPO. After the jury rendered its verdict, finding in favor of XPO on its claim for action on account and awarding XPO $3,166,837.01 in damages, and after the district court entered judgment accordingly, XPO moved to alter or amend the judgment to include an award of prejudgment interest. The district court found that XPO was entitled to the statutory prejudgment interest rate of 9% per annum, see Mo. Rev. Stat. § 408.020 (1979),[8] and awarded XPO $643,301.37 in prejudgment interest. "We review the statutory right to prejudgment interest pursuant to section 408.020 *de novo*." Barkley, Inc. v. Gabriel Bros., Inc., 829 F.3d 1030, 1039 (8th Cir. 2016) (quoting Mitchell v. Residential Funding Corp., 334 S.W.3d 477, 508 (Mo. Ct. App. 2010)).

Under Missouri law, "[a]wards of prejudgment interest are not discretionary; if the statute applies, the court must award prejudgment interest." Mitchell, 334 S.W.3d at 509 (cleaned up); see also Assurance Gen. Contracting, LLC v. Ekramuddin, 604 S.W.3d 761, 772 (Mo. Ct. App. 2020) ("The purpose of statutory pre-judgment interest is to promote settlement of lawsuits and fully compensate plaintiffs by accounting for the time-value of money."). For an award of prejudgment interest, three requirements must be met: "(1) the expenses must be due; (2) the claim must be liquidated or the amount of the claim reasonably ascertainable; and (3) the obligee must make a demand on the obligor for the amount due." Barkley, Inc., 829 F.3d at 1039 (quoting Jablonski v. Barton Mut. Ins. Co., 291 S.W.3d 345, 350 (Mo. Ct. App. 2009)).

---

[8]Missouri law governs the issue of prejudgment interest in this diversity action. See Macheca Transp. Co. v. Phila. Indem. Ins. Co., 737 F.3d 1188, 1196 (8th Cir. 2013).

First, SMI argues that it is not obligated to pay prejudgment interest on a category of damages that amounted to $1,719,788.00 of the jury's total damages award. The parties refer to this category of damages as the "labor credits," an amount SMI withheld—pursuant to the Agreement's "true-up" provision[9]—from payments owed to XPO. See Agreement § 4(a)(i)[D]. SMI argues these "labor credits" were unliquidated in part because the parties "genuinely disputed if and how the true-ups should be conducted." See Barkley, Inc., 829 F.3d at 1039–40.

"In order to be liquidated so as to allow interest, a claim must be fixed and determined or readily determinable." Macheca Transp., 737 F.3d at 1196; see also Barkley, Inc., 829 F.3d at 1039 ("The denial of prejudgment interest for unliquidated claims 'is based, generally, on the idea that where the person liable does not know the amount he owes he should not be considered in default because of failure to pay.'" (quoting Fohn v. Title Ins. Corp. of St. Louis, 529 S.W.2d 1, 5 (Mo. banc 1975))). To begin, the amount of these "labor credits" was reasonably ascertainable because SMI *itself* determined that amount when it unilaterally decided to withhold payments from XPO for its properly invoiced amounts due. Moreover, even assuming the parties disagreed about the applicability or proper calculation of the Agreement's true-up mechanisms, "a dispute over the actual amount owed" does not render a claim unliquidated. Macheca Transp., 737 F.3d at 1197; see Comens v. SSM St. Charles

[9]In the payment provision of the Agreement, XPO and SMI provided for a "true-up" mechanism. Pursuant to this provision, the parties would agree to a budget for a given accounting period. Agreement § 4(a)(i)[C]. If XPO operated the facility under budget, it would receive a monetary reward equal to 50% of the dollar amount by which it was under budget (*i.e.*, an incentive to be cost-efficient). If XPO operated the facility over budget, SMI would deduct a penalty from its payment equal to 50% of the dollar amount by which it exceeded budget. When SMI withheld $1.7 million in "labor credits," it claimed it was doing so to "true up on the account" under the "true-up" mechanism.

-22-

Clinic Med. Grp., Inc., 335 S.W.3d 76, 82 (Mo. Ct. App. 2011) ("The mere fact that a party denies liability or defends a claim against him or her, or even the existence of a bona fide dispute as to the amount of the indebtedness, does not preclude recovery of interest." (cleaned up)). The district court did not err in finding that XPO's claim for "labor credits" was liquidated.

Next, SMI asserts that the district court erred in concluding that XPO was entitled to prejudgment interest because XPO's invoices were not "demands" for payment. See Barkley, Inc., 829 F.3d at 1039. Prejudgment interest is allowed "only after demand of payment is made." Juan v. Growe, 547 S.W.3d 585, 597 (Mo. Ct. App. 2018). "Although the demand need be in no certain form, it must be definite as to amount and time." Nusbaum v. City of Kansas City, 100 S.W.3d 101, 109 (Mo. banc 2003). Contrary to SMI's argument, Missouri courts have recognized that invoices qualify as demands for payment. See, e.g., Juan, 547 S.W.3d at 598; City of Cape Girardeau ex rel. Kluesner Concreters v. Jokerst, Inc., 402 S.W.3d 115, 125 (Mo. Ct. App. 2013); Doe Run Res. Corp. v. Certain Underwriters at Lloyd's London, 400 S.W.3d 463, 477 (Mo. Ct. App. 2013). The district court did not err in finding that XPO's invoices to SMI were definite as to the amount owed and the time within which to be paid. SMI's argument that XPO was required to separately invoice SMI for the amounts SMI unilaterally withheld as "labor credits" from XPO's otherwise properly submitted invoices is likewise unavailing. See Agreement § 4(a)(i)[A] (requiring SMI to pay invoices within eight days of their issue date).

We affirm the district court's grant of statutory prejudgment interest to XPO.

-23-

## III. XPO's Arguments on Cross-Appeal

*A. Denial of Judgment as a Matter of Law on SMI's Breach of Contract Counterclaim.*

First, XPO argues that it was entitled to judgment as a matter of law on SMI's breach of contract claim because there was insufficient evidence to support any award of damages for that claim. We review the district court's denial of a renewed motion for judgment as a matter of law de novo, viewing the evidence in the light most favorable to the jury's verdict. See Adeli, 960 F.3d at 458; see also Letterman v. Does, 859 F.3d 1120, 1124 (8th Cir. 2017) ("The court is not at liberty to reweigh the evidence or consider questions of credibility, and it must give great deference to the jury's verdict." (cleaned up)). To determine whether judgment as a matter of law is warranted, we look to "[w]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Axelson v. Watson, 999 F.3d 541, 546 (8th Cir. 2021) (quoting Kinserlow v. CMI Corp., 217 F.3d 1021, 1025 (8th Cir. 2000)). "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." Letterman, 859 F.3d at 1124.

XPO contends that SMI failed to introduce evidence that would have enabled the jury to calculate a damages award without speculation, and more specifically, that SMI failed to introduce evidence that would have permitted the jury to award an amount of $147,000, which it in fact awarded to SMI. "Under Missouri law, a plaintiff in a contract action generally has the burden of proving 'the existence and amount of . . . damages with reasonable certainty.'" Cole v. Homier Distrib. Co., 599 F.3d 856, 864 (8th Cir. 2010) (quoting Ullrich, 244 S.W.3d at 779). "Stated otherwise, proof of actual facts which present a basis for a rational estimate of

damages without resorting to speculation is required." Delgado v. Mitchell, 55 S.W.3d 508, 512 (Mo. Ct. App. 2001) (cleaned up).

The parties agree that SMI submitted two damages theories on its breach of contract claim. First, SMI sought more than $2 million in damages for the lost inventory it attributed to XPO's alleged mismanagement of Northpark. Second, SMI sought $248,249 in "clawback" damages—damages reflecting amounts that SMI allegedly overpaid to XPO. SMI offered evidence to support both theories, including evidence and testimony demonstrating substantial quantities of lost or damaged inventory and potential overpayment by SMI under the Agreement's "true-up" mechanism, and the jury could have relied on either or both theories and their attendant evidence to issue an award.

However, looking to the $147,000 the jury did in fact award, XPO argues that the jury could have awarded damages only under the lost inventory theory and that there was insufficient evidence for the jury to do so.[10] XPO reasons that the jury's ultimate award was "inconsistent" with the clawback calculations presented by SMI and the jury's damages award to XPO on its action on account claim, which included approximately $1.7 million that SMI unilaterally withheld as "labor credits" under the true-up mechanism. See supra Section II.G.

---

[10]Because we conclude that there was sufficient evidence to support the jury's award of $147,000 under the "clawback" theory of damages, we need not address XPO's latter argument that SMI did not provide evidence that detailed the amount of lost inventory that exceeded XPO's loss allowance under the Agreement. See Agreement § 6(i) ("XPO shall be entitled to an allowance for loss of, or damage to inventory equivalent to one percent (1%) of the cases received and the cases shipped annually by each department at the Facility.").

In closing argument, XPO told the jury that if they found that XPO "underperformed" or "should have done better," it could "take the management fee[11] of $147,000 away." In other words, XPO invited the jury to award SMI a clawback of XPO's management fee if it concluded that XPO breached the Agreement by failing to abide by the prevailing industry warehouse standards. And by our reading, that is what the jury did. There was a sufficient evidentiary basis for the jury to award breach of contract damages to SMI. Cf. In re Japanese Electronics Prods. Antitrust Litig., 631 F.2d 1069, 1079 (3d Cir. 1980) ("The law presumes that a jury will find facts and reach a verdict by rational means. It does not contemplate scientific [or accounting] precision but does contemplate a resolution of each issue on the basis of a fair and reasonable assessment of the evidence and a fair and reasonable application of the relevant legal rules.").

*B. Denial of Attorney's Fees to XPO.*

Finally, XPO argues that the district court erred by determining that XPO was not entitled to attorney's fees under Section 6(h) of the Agreement. "We review de novo the legal issues related to an award of attorneys' fees, while the actual award is reviewed for an abuse of discretion." Snider v. City of Cape Girardeau, 752 F.3d 1149, 1159 (8th Cir. 2014).

Missouri law[12] adheres to the American rule, under which "litigants ordinarily bear the expense of their own attorneys' fees." Green v. Plaza in Clayton Condo.

---

[11]Under the Agreement, in addition to receiving direct compensation for its weekly fixed and variable operating costs managing Northpark, XPO was entitled to a management fee equaling 7% of the sum of those costs. See Agreement § 4(a)(i).

[12]"State law governs the availability of attorney fees in diversity cases where no conflicting federal statute or court rule applies." Ryan Data Exch., Ltd. v. Graco, Inc., 913 F.3d 726, 735 (8th Cir. 2019).

Ass'n, 410 S.W.3d 272, 280 (Mo. Ct. App. 2013). "[A]ttorneys' fees are only recoverable when a statute specifically authorizes recovery or when attorneys' fees are provided for by contract." Essex Contracting, Inc. v. Jefferson Cnty., 277 S.W.3d 647, 657 (Mo. banc 2009). "If a contract provides for the payment of attorneys' fees and expenses incurred in the enforcement of a contract provision, the trial court must comply with the terms of the contract and award them to the prevailing party." DocMagic, Inc. v. Mortg. P'ship of Am., L.L.C., 729 F.3d 808, 812 (8th Cir. 2013) (quoting Clean Uniform Co. St. Louis v. Magic Touch Cleaning, Inc., 300 S.W.3d 602, 612 (Mo. Ct. App. 2009)). We review de novo the district court's interpretation of an attorney's fees provision in a contract. See Jet Midwest Int'l Co. v. Jet Midwest Grp., LLC, 932 F.3d 1102, 1105 (8th Cir. 2019).

On appeal, XPO argues that Section 6(h) of the Agreement is a general attorney's fees provision that entitles XPO to attorney's fees as the prevailing party in this litigation. XPO relies almost entirely on the final sentence of Section 6(h) to expansively argue that it is entitled to attorney's fees: "The prevailing party in Alternative Dispute Resolution or litigation shall be entitled to recover (and the non-prevailing party shall be obligated to pay) all costs and expenses incurred by the prevailing party in connection therewith including reasonable attorney fees, third party fees for Alternative Dispute Resolution, and court costs." Agreement § 6(h). But XPO largely ignores the eight immediately preceding sentences in Section 6. These sentences lay out the "Inventory Claim Procedure," the procedure pursuant to which XPO was to reimburse SMI for any inventory that is identified as damaged, spoiled, out-of-date, or missing during an inventory "cycle count." And, if SMI and XPO were unable to resolve claims for such lost or damaged inventory, the parties were to seek alternative dispute resolution before resorting to formal legal proceedings. See id.

Read as a whole, see Knob Noster R-VIII Sch. Dist. v. Dankenbring, 220 S.W.3d 809, 816 (Mo. Ct. App. 2007) ("The primary contract interpretation rule is

to rely on the plain and ordinary meaning of the words in the contract and to consider the document as a whole."), Section 6(h) guarantees the recovery of attorney's fees only if the dispute arises in the context of an "Inventory Deficiency" and SMI and XPO abide by the Inventory Claim Procedure set forth in the provision. Contrary to XPO's argument, the fee-shifting provision is not "a separate agreement" from the other provisions of Section 6(h). XPO does not contend that this lawsuit arose from a dispute under Section 6(h), and we agree with the district court that Section 6(h) does not authorize the recovery of attorney's fees in this case. Contra Parkway Constr. Servs., Inc. v. Blackline LLC, 573 S.W.3d 652, 666–68 (Mo. Ct. App. 2019) (construing a broadly worded provision, entitling the recovery of attorney's fees "in any dispute . . . arising out of or relating to" the contract, to award the plaintiff attorney's fees).

## IV. Conclusion

For the foregoing reasons, we affirm the judgment of the district court in its entirety.

_____